CLAIRE J. ULRICH WHITEHURST *v.* M. MORRIS WHITEHURST ET AL.

[No. 89, October Term, 1928.]

*Decided March 20th, 1929.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*William L. Marbury* and *Randolph Barton, Jr.,* with whom were *William R. Semans* and *William L. Marbury, Jr.,* on the brief, for the appellant.

*Vernon Cook* and *George Ross Veazey,* for the appellees.

ADKINS, J., delivered the opinion of the Court.

Charles E. Whitehurst died on January 30th, 1924, intestate. On February 7th, 1924, letters of administration upon his estate were granted by the Orphans' Court of Baltimore City to M. Morris Whitehurst and J. Herbert Whitehurst, brothers, and to Anna L. Whitehurst Taylor, mother, of the deceased, who duly qualified. On August 8th, 1924, Claire J. Ulrich Whitehurst, the alleged widow of the deceased, filed a petition alleging that she was the widow of the deceased and as such was entitled to administer his estate, and that the letters of administration theretofore granted had been improvidently granted and should be revoked. On September 3rd, 1924, the administrators filed an answer to said petition denying that the petitioner was the widow of the deceased, and asserting that he died unmarried. Pending

612

these proceedings in the orphans' court an alleged settlement was reached, and a deed was executed by the plaintiff herein to the said Anna L. Whitehurst Taylor on January 9th, 1925. In this deed there are recitals of the death, intestate, of the said Charles E. Whitehurst; and the claim of "Claire J. Ulrich" to be his widow and to have the right to share in his estate and to use his name; and the desire of the grantor to sell all of said rights "and particularly any right that she may now have or thereafter acquire as the alleged widow of Charles E. Whitehurst, in the estate of said Charles E. Whitehurst * * *"; and the willingness of said grantee to purchase the same; and in consideration of the premises and the sum of five dollars the grantor grants, conveys and re-leases to the grantee all the rights recited, and particularly all the right, title and interest in and to any part of the estate of Charles E. Whitehurst, and any claim or right of action against said estate as the alleged widow of said dece-dant. The deed is signed by the grantor in three different ways, viz: "Mrs. Claire J. Ulrich Whitehurst," "Mrs C. E. W.", "Claire J. Ulrich"; and it is "accepted for the estate of Charles E. Whitehurst, by M. Morris Whitehurst, admin-istrator." On January 31st, 1925, the net estate, amounting to $271,716.48, was distributed to Mrs. Taylor. Subsequent-ly, on October 17th, 1925, the bill of complaint in this case was filed by the alleged widow against Mrs. Taylor on the ground of fraud in procuring the said settlement. The de-fendant demurred to the bill, the demurrer was overruled, and on appeal to this court the ruling of the chancellor was affirmed.

In the opinion of this court, reported in 151 Md. 621, the allegations of the bill are sufficiently set out. The answer of the defendant filed December 30th, 1926, denies the material allegations of the bill. On February 16th, 1927, the death of the defendant was suggested by the petition of her exec-utors, and on March 3rd, 1927, the executors were substituted as parties defendant.

The chancellor, after considering the many depositions

filed, and the mass of testimony taken before him, found against the validity of plaintiff's claim to be the widow of the decedent, and dismissed the bill. This appeal is from that decree.

The two questions we have to decide are: (1) Was plaintiff the lawful wife of Charles E. Whitehurst? (2) If she is the widow of the decedent, did she effectually convey and release her interest in his estate by the deed of January 9th, 1925?

The answer to the first question depends upon the genuineness of an alleged agreement between the plaintiff and the said Charles E. Whitehurst to become husband and wife on the night of April 9th, 1923, claimed by plaintiff to be evidenced by the writing of their names in a prayer book. The prayer book offered in evidence contains a ceremony for mixed marriages. (In this case the plaintiff was a Catholic and Whitehurst a Protestant.) At the part of the ceremony, page 449, where the man takes the woman to be his wife, appear the words "Charles" and "Claire," and on page 450, where the woman takes the man to be her husband, appear the words Claire and Charles. The contention of the appellant is that the names on page 449 were written by Charles, and those on page 450 were written by Claire.

The chancellor, over objection, permitted the plaintiff to testify as to the alleged ceremony, on the theory that the suit was not against a "distributee as such" but was against Mrs. Taylor as assignee taking under the assignment executed by the plaintiff. We think this was error. Code, art. 35, sec. 3, provides: "In actions or proceedings by or against distributees of a decedent as such, in which * * * decrees may be rendered for or against them, * * * no party to the cause shall be allowed to testify as to any transaction had with or statement made by the * * * intestate." The right of the plaintiff to recover in this suit depended upon the existence *vel non* of a transaction alleged to have been had by her with the decedent, and upon her being a lawful distributee. She could sue only as a distributee. Her testimony, therefore, as to transactions with the decedent should have been excluded. We are there-

fore left to the testimony of handwriting experts, to our own comparison of the handwriting in the prayer book, and to the testimony of Mrs. Anna Stevenson, a witness offered by plaintiff, but manifestly a hostile witness.

The defendant's expert was sure, with a sureness characteristic of most experts, that none of the writing in the prayer book was done by Charles, but all was by Claire. The plaintiff's expert was more impressive, because he seemed to forget for whom he was testifying, or rather appeared to be indifferent to the effect of his testimony. He testified without reservation that the "Charles" on page 449 was written by the decedent, and that both names on page 450 were written by plaintiff. As to the "Claire" on page 449, he testified that on his first examination he was inclined to believe it was an imitation, for reasons which he stated, but on comparison with other admitted writings of this name by the decedent, he found the same defects as in the disputed writing, and, while he could not give a positive opinion, theoretically, he said, "taking that altogether, I have a pretty good notion, and I am strongly inclined to believe, that Mr. Whitchurst wrote that signature, and I can give a positive opinion if I knew what caused him to slow up in this writing." Here, speaking of presumptions, and evidently referring to a presumption as to what might have caused Charles to slow up in his writing, he added "my inference would not be worth two cents." This expression counsel for defendant, we think erroneously, interpreted to mean that his opinion as to who wrote the word "Claire" would be worthless. The impression made upon us by Mr. Farrar, plaintiff's expert, is strengthened by our own examination and comparison.

In this connection the testimony of Mrs. Anna Stevenson is most important. She was obviously hostile, and seemed to testify reluctantly to anything that could be of advantage to plaintiff. Her testimony was taken in New York, and she testified in the presence and under the scrutiny of her husband and his father and mother, who refused to leave the room while she was testifying, although requested to do so. By reason of their unfriendly attitude plaintiff's counsel

declined to put them on the stand after having summoned them to testify for plaintiff, and they were subsequently used by defendants, under whose influence they evidently were.

On the stand Mrs. Stevenson was shown a statement she had made in her own handwriting and testified, "I don't think there is anything there isn't true." When questioned in detail the only thing which she said did not happen as appeared in the statement was that she went with Claire to the station to meet Charles. The statement follows:

"Saturday Claire sent telegram to come to New York. I called long distance and Claire said to come on to New York; she had something to tell me. I left Sunday morning, arrived in New York at 2 o'clock; Claire met me at station. Went to Martha Washington Hotel and Claire explained they were going to be married (she and Charles) on Monday evening. Monday eve at about 8 o'clock we went to Penna. Station to meet Charles, took taxi to hotel; Claire and Charles left me at hotel; had telephone call that evening, Claire asked if I was all right; had telephone call next morning from Charles, said Claire was fine and would be over shortly; Claire came at eleven o'clock and took me to breakfast; she had had breakfast; went shopping until time to meet Charles at Knickerbocker Grill about 1.30. Conversation at café was to effect Charles asked me as a lifelong friend of Claire what my opinion of their marriage was. I said to explain it. He said last night Claire and I were married by having a ceremony ourselves. I said, Didn't you go to church to be married? He said, 'No,' I couldn't on account of my mother. Anna, he continued, you do not know my mother; she is a very jealous woman. I am tied down to her terribly; have to wait on her hand and foot. I didn't want publicity, but he said I consider Claire and I married before God. It would be impossible to be married any other way. I said I considered them married under those conditions. Left grill, went shopping; left for Lansdale 6 o'clock."

(Signed)  Anna Reeves Stevenson

616.

The testimony shows that the Monday referred to in the above statement was Monday, April 9th, 1923.

That statement not only makes it probable that the names were written by Charles and Claire respectively, but that they were written in connection with the ceremony referred to in the statement. Indeed, assuming, as we must, that statement to be true, it would be difficult to reach any other conclusion than that that was what Charles meant when he said "last night Claire and I were married by having a ceremony ourselves." Indeed Mrs. Stevenson testified that Whitehurst explained the marriage ceremony to her, although she said she could not remember what it was.

It is argued by defendant's counsel that the statements made by Mrs. Stevenson about plaintiff and Whitehurst could be easily explained as efforts to prevent a friend of plaintiff from thinking her relations with Whitehurst were of a meretricious character. But there was no reason why Mrs. Stevenson should ever have discovered they were living together. Plaintiff was at the hotel, where up to that time she had been living, and Whitehurst was in Baltimore when Mrs. Stevenson arrived. Nothing would have been easier than for plaintiff and Whitehurst to have arranged to remain apart until after Mrs. Stevenson left. She was not in the habit of visiting plaintiff, and the ingenuity and craftiness with which plaintiff is credited by defendants could readily have found means of providing against discovery thereafter. It was not as if plaintiff had been taken unawares by this visit. According to Mrs. Stevenson, plaintiff invited her to come to New York for the very purpose of telling her she was about to be married.

On the night of the alleged marriage, plaintiff and Whitehurst began their life together at the apartment, and from that time they continued to live together until his death the following January, he spending about four days in each week in Baltimore, where he had several theatres. During these absences she remained at the apartment and, in spite of all the efforts of defendants to find evidence to the contrary, there is not even a suspicion that she was other than

faithful to him, notwithstanding she was left alone so much of the time. There could be no better evidence that Mrs. Stevenson regarded them as married than the fact that some months later she and her mother spent a night with her at the apartment. Indeed there is no substantial evidence that her manner of living had ever been loose or immoral. It is significant that two of the men friends of Whitehurst, who had previously shared the apartment with him, never stayed there after the date of the alleged marriage, but surrendered their keys, although they had used them when Whitehurst had other women in the apartment.

Much is attempted to be made by defendants of the fact that the prayer book was not shown any of the several lawyers who were from time to time retained by plaintiff until the last New York attorney was employed. But that loses any unfavorable significance when it is recalled that when she told Mr. Leach, of the Baltimore bar, her first attorney, about the book, he did not regard it as of any importance and spoke of it as fol-de-rol. Eisenberg, the next in order, was told about the book, but he, too, treated it as a matter of no immediate concern, and did not even mention it to Mr. Marbury, his associate in Baltimore. So far as Mr. Leach is concerned, it is not remarkable that a Maryland lawyer should have been unfamiliar with common law marriage, being accustomed here to the strict requirement of a religious ceremony. With so little encouragement it is not surprising that the book was not sooner exhibited. She evidently spoke of the prayer book very soon after Whitehurst's death to a Mrs. Genzberg, and referred to it when she spoke to a Mrs. Wells of a marriage certificate which she said Whitehurst had told her constituted a legal marriage, but which she had found was only a fake.

A large array of witnesses were produced by defendants to testify that Whitehurst was regarded by his friends, and held himself out, as an unmarried man; that plaintiff was known and addressed as Miss Claire Ulrich, registered at hotels, and kept her bank account, in that name. But what else was to be expected if the marriage was to be kept secret ?

618

Mrs. Stevenson was not the only witness who testified as to Charles' explanations of his reasons for secrecy.

The story told by Padden, one of defendants' witnesses (if any credence is to be given to one whose testimony in general is inherently unreliable), of a dinner party, composed of Mr. and Mrs. Padden and Whitehurst and plaintiff, the night after the night of the alleged wedding is another instance. The Paddens were celebrating a wedding anniversary, and Whitehurst proposed a toast to Mr. and Mrs. Padden, "and Miss Ulrich stood up and said, 'Well, drink to Mr. and Mrs. Whitehurst also'; and Mr. Whitehurst told her that never would there be a 'Mrs. Whitehurst' except his mother, as long as his mother was in existence, and she was kind of hurt and got very panicky and nervous." That story was told for the purpose of showing a repudiation by Whitehurst of the idea of marriage between himself and plaintiff. But it could well be interpreted as an impulsive outburst of Mrs. Whitehurst, forgetting momentarily the necessity for secrecy. She would hardly have made such a bold suggestion without foundation.

Several other witnesses, called by defendants, testified that Whitehurst had often said he would never marry so long as his mother lived.

The marriage, however, was not kept entirely secret. We have spoken of the very full explanation made by both the plaintiff and Whitehurst to Mrs. Stevenson. He also introduced plaintiff to trades people, with whom she would come in contact, as Mrs. Whitehurst, notably to Mrs. Wells, to whom he said: "She is no longer Miss Ulrich, but Mrs. Whitehurst." The weight of the testimony, in our opinion, shows that she was known by the employees at the apartment as Mrs. Whitehurst until they came under the influence of defendants and their agents after the death of Whitehurst.

The fact that Whitehurst wrote to plaintiff whenever he was away, even for a few days, would indicate that he regarded her as something more than a kept woman. True, some of these letters are coarse, but not more so than would be expected of the man defendants have made him out to

have been. There is also testimony that he indicated to some of his friends that plaintiff was his mistress; but that might mean nothing more than that he had not intended as a marriage the ceremony and relationship into which he had inveigled the plaintiff. We prefer, however, to believe that such representations were a part of the scheme of a coarse but not unkindly man to keep his marriage a secret, rather than that he was a conscienceless betrayer. But even if it be a fact he did not intend the ceremony which he went through to constitute a marriage, and attempted afterwards to repudiate the existence of such a status, such want of intent on his part would not make the ceremony a nullity if he induced plaintiff to believe it valid. As was said in *Bissell v. Bissell,* 55 Barb. 325, if a man, while endeavoring to accomplish a woman's seduction, blunders into matrimony, he has no one but himself to blame.

Having reached the conclusion that the writing in the prayer-book was genuine, and that the ceremony was intended to constitute a contract *per verba de presenti* between the parties; that it was followed by cohabitation; that there was a definite and explicit declaration and acknowledgment of the marriage following the ceremony, and introduction to some, at least, of those with whom the parties came in contact in business and domestic relations, the question is: Did all of these things constitute a valid marriage under the law of New York? Our conclusion is that they more than met the requirement of that law, on the testimony of Mr. Matthews, a reputable New York lawyer, who testified as an expert for plaintiff, and whose opinion we think is supported by the New York decisions. He said: "The essentials of a valid marriage under the law of New York are, first, two parties competent to be married, a man and a woman otherwise competent to be married, and an agreement presently to become, and assume the obligations towards each other of, husband and wife." He further testified that neither repute nor cohabitation is necessary, once the agreement of marriage is established. Such a marriage is described, technically, as a marriage *per verba de presenti.*

Mr. Matthews is supported in his view by the author of a very full note to *Grigsby v. Reib,* L. R. A. 1915 E, note beginning at page 8, and by the author of the note to *Peters v. Peters,* 33 A. L. R., note beginning at page 27. In both these notes the New York authorities are collected, and it is definitely stated that New York is among the states which hold the view above stated; and Mr. Koegel in his book on *Common Law Marriage,* page 164, also includes New York among the states so holding. See also 2 *Kent,* pages 86 and 87; *Bishop on Marriage, Divorce and Separation,* secs. 317 *et seq.*

It is not necessary, however, to go that far in this case, and, after a careful reading of Judge Hiscock's testimony, as an expert for defendants, we are of the opinion that the facts found by us would constitute marriage in New York even in his view. For we do not believe he meant to go so far as to say that in a case where there was satisfactory proof of an agreement *per verba de presenti* it would be necessary to prove not only repute, but an undivided repute. Undoubtedly that is necessary where the marriage is to be inferred solely from cohabitation and repute. To hold that undivided repute is necessary in a case such as the present one, would be to hold that the same character and amount of proof of repute is required to establish a marriage where an actual contract is proved, as would be necessary where there is no evidence of an actual contract, and it is sought to have a contract inferred from cohabitation and repute alone.

Our conclusion is that the plaintiff was lawfully married to Charles E. Whitehurst, and that she is entitled to the widow's share in his estate, less the amount she has already received, unless the deed purporting to convey her interest is a valid instrument.

Plaintiff claims that she was induced to execute the deed by misrepresentation and fraud. She is of course a competent witness as to what occurred in connection with the settlement.

Her testimony is that the deed was brought by Ascher in Walsh's room and read by him to her in the presence of

Walsh, and in this she is corroborated by Walsh; that Ascher "told me that it recognized me as the widow, and he read it to me where it said that it did: 'And to have the right to share in his estate and in his name.'" After that was done she agreed to sign and did sign one paper; that she first signed Mrs. Claire J. Ulrich Whitehurst; that Ascher then took the paper out of the room, and came back again and said "you better sign this again,—they want a different signature of yours; a different name"; that she then signed "Mrs. C. E. W.," and Ascher again took the paper out and came back and said "They want you to sign your stage name." Witness continued, "Then it occurred to me that I did not see why I was signing anything anyway because it was up to them to sign the paper, and so I had this paper and Mr. Ascher said to sign it again, and Mr. Walsh said, 'You might as well do it, they want to make sure they have every name that you have ever had,' so I said, 'Mr. Ascher, I do not see why I should sign my name, it is up to them to recognize me and not me to recognize myself,' and so then he said, 'Well, give me the paper and I will take it out,' and I said, 'No, you go out and get them to sign their own names on it or make them come in and sign it before I let them have my signature,' and then I decided there was something funny, and Mr. Ascher went out. He said 'Give me the paper,' and I said, 'No, I will tear it up before I give it to you,' and then Mr. Walsh sort of fussed about it. He said, 'Well, I don't know that we better bother talking about it. This seems like a lot of trouble for nothing. I don't know why they want so many signatures." Then Mr. Ascher went out and came back and said, 'Well, they signed the paper,' and brought me the settlement agreement that I have with the notary typewritten on, and the name, the agreement and acknowledgment was accepted for the estate by Milton Whitehurst." That up to this time she had not seen Mr. Winslow at all; that after he gave her the paper that had their signatures on it, Walsh said he thought that was all right, and agreed with her that she should have it; that Ascher again left the room and upon his return said "Now, just sign 'Claire J. Ulrich,' that is all they want, and

then they have all the names," and she replied "Well, all right"; that Ascher then told her, "It does not make any difference anyway, you have three different signatures and it acknowledges you and there cannot be any question about it, just sign it," and she signed again as requested; that Ascher asked her to come out and acknowledge the signature to Mr. Winslow; that Ascher introduced her to Winslow, and Winslow said "Do you acknowledge this paper?" and she replied, "Why, if it acknowledges me as the widow, that is all I want"; and Winslow replied, "Well, it does; you can read it."

There is no substantial difference between her testimony and Ascher's as to what occurred at the time of the execution of the paper, except that Ascher denied that Winslow told her it acknowledged her as the widow. Winslow also denied that he said the paper acknowledged her as the widow.

Referring to an interview that preceded the execution of the deed, Ascher denied that he told her he had arrived at an agreement which would recognize her as the widow of Charles E. Whitehurst, and said he told her they refused to accept her in the family. But there is no evidence that he said a word to undeceive her as to the effect of the written acceptance and acknowledgment by the administrator, nor did he deny that at that time he told her the deed recognized her. But even if he had denied it, we could not give such testimony much credence, in view of the fact that he permitted his client to remain in ignorance of the futility of the things she was insisting upon as conditions to her executing the deed, and actually obtained those meaningless concessions for her.

Walsh's testimony corroborates plaintiff in regard to Ascher's reading the paper to her. He was asked: "Did he (Ascher) make any statement to her that it did, that is, the paper recognized or did not recognize her as the widow of Charles E. Whitehurst? A. He read something from it that stated that, I believe. Q. That stated what? A. Something about recognizing her as Mrs. Whitehurst."

So it would appear that plaintiff was not alone in believing that Ascher was so representing the paper. But whether he did so represent it or not, or whether Winslow did or not, we

are satisfied plaintiff understood that the acceptance of the paper for the estate by one of the administrators in the manner it was done had that effect, and that both Ascher and Winslow knew she executed it with that understanding.

In this connection it may be well to consider what bearing the quotation in appellees' brief from *Smith v. Humphreys,* 104 Md. 290, and *Smith v. Martin,* 154 Md. 462, at page 476, has upon the facts of the present case. There it was said in substance that one who can read and who has average intelligence but asks the aid of a court of equity in getting rid of a document, which he did not read, on the ground of ignorance, should be required to establish a very clear case before receiving the assistance of the court. That clearly had reference to the amount of proof required in such a case, and does not apply to a case where the defendant's agent actually knew of the misapprehension of the plaintiff, and that she executed the deed under such misapprehension. Here the agent knew that there was no meeting of the minds of the parties to the contract.

Both Ascher and Winslow are lawyers, and they certainly knew that the noting on the deed, "Accepted for the estate of Charles E. Whitehurst," added nothing to the effect of the deed; and they knew equally well that plaintiff thought it was of importance; and neither of them did or said anything to enlighten her. Winslow admits that he knew it was meaningless, so far as any legal effect was concerned. He said: "I told Mr. Ascher it was meaningless and it did not do us any harm, and if it satisfied her in any way my client would do it." "Q. In addition to your having gotten Mr. Milton Whitehurst to do this meaningless act of signing or accepting for the estate of Whitehurst, even that did not satisfy her? A. No; she wanted the acknowledgment. Q. Was it by your advice that Mr. Milton Whitehurst responded to that and acknowledged it? A. I did not advise him to do it. I said it was all right for him to do it." Winslow further said "I thought she was temperamental, according to Mr. Ascher."

But he must have known that the matter of recognition of her status as the widow of Whitehurst was important to plain-

tiff. He and the Whitehursts knew that she was insisting on that, and that her Baltimore lawyers had made it a condition to any settlement. He testified: "I did not know that definitely, I heard there was some proposition she must be recognized." "Q. Mr. Herbert Whitehurst said he told you that in consequence of that he gave up trying to settle through Howard Bryant? A. I heard Dr. Whitehurst say Mr. Bryant was insisting on that." Winslow further admits that Ascher was trying in the negotiations immediately preceding the settlement to secure such recognition. Mr. Marbury testified that plaintiff's main desire was to be recognized as the widow; that she did not seem to care about the money.

Eisenberg testified that she refused to consider an offer of $15,000, and Ascher knew this, because the offer is referred to in the agreement between Eisenberg, Marbury, Ascher, and plaintiff in regard to fee. Having this knowledge, Ascher must have known that plaintiff's alleged enthusiasm about the settlement, and her alleged desire to reward Walsh for the great service he had rendered her, were not based on the pecuniary results of the settlement, even if she knew that the amount paid was $16,000 instead of $11,000, which is questionable.

We are not holding that Mrs. Taylor was charged with Ascher's knowledge. But she was bound by the knowledge of Winslow, her agent, and for what Winslow as a lawyer and intelligent man ought to have inferred from the conduct of Ascher.

Our conclusion is that the deed should be declared a nullity, because Winslow knew that there was not a meeting of the minds of the parties, as to something he knew plaintiff regarded as an essential element of the contract. If the deed were permitted to stand, plaintiff would be deprived of, and defendants would acquire, a valuable interest in Whitehurst's estate, under a contract which did not in fact provide for the substantial, if not the most important, part of the consideration for which plaintiff thought she was parting with it, defendant's agent knowing at the time that she was acting under such misapprehension. This finding, we think,

is well within the principle of the decision in *Brager v. Friedenwald,* 128 Md. 8. It is not necessary to find that the motives of Ascher and Mrs. Taylor's agents were fraudulent. It is enough, and we find, that their conduct in the matter of the settlement amounted to fraud in law.

There are a number of facts immediately connected with this transaction, and leading up to and following it, of a questionable character, which we have not found it necessary to discuss, or to make the basis of our decision.

In accounting with the plaintiff the defendants should be credited with the sixteen thousand dollars paid to Ascher, her attorney. While the circumstances give rise to suspicion, we are unable to find *as a fact* from the record that Mrs. Taylor or her agents were parties to the improper disposition of any part of that fund.

> *Decree reversed, and case remanded in order that a decree may be passed in accordance with this opinion, with costs to the appellant.*

---

BOND, C. J., filed the following dissenting opinion, in which OFFUTT and SLOAN, JJ., concurred:

It seems to me quite clear that another view can be taken of this case, and I think it is the correct view.

It is obviously true that no considerations of the policy of Maryland courts in respect to marriage without the statutory formalities of license and ceremony is to interfere if it is found that such a marriage as is contended for took place and is valid under the laws of the State of New York. There should be in this case not even an inclination against giving the New York law its full effect. At the same time there should, of course, be no inclination toward finding such a marriage by means of any presumption or preference, or by anything short of a preponderance of the proof and the probabilities. Well known facts would prevent it. For we

know that such cohabiting as the complainant and the decedent did in New York in this instance is common without any intention of marriage, more common than before, probably, under conditions of life in very large cities. We know that illicit unions exist, and as has been remarked in many judicial decisions, those unions are almost always, if not always, surrounded and screened by some pretensions to marriage, some keeping up of appearances where it seems desirable. *Cunningham v. Cunningham,* 2 Dow, 482; *Rose v. Clark,* 8 Paige (N. Y.), 574, 582; *Bicking's Appeal,* 2 Brewst. (Pa.) 202, 232; *Port v. Port,* 70 Ill. 484, 487; *Cross v. Cross,* 55 Mich. 280, 287; *In re Terry's Estate,* 58 Minn. 268, 274; *Redgrave v. Redgrave,* 38 Md. 93, 102. And, further, it now appears to be demonstrated to us by the experience of the United States Bureau of War Risk Insurance, that in this day of easy, habitual formal procedure for complete marriage, the parties who, in states where there can be a legal common law marriage, are satisfied to consider themselves married by a common law method, rarely if ever consider themselves legally married, so that, for instance, a divorce would be necessary to dissolve their relation. Koegel, the author of the latest study of common law marriage, who had charge of investigations of thousands of claims by common law wives filed in that bureau during or after the late war, says, "Moreover, very few, if any, of these persons really believe that they are married. Scarcely any of these persons believe that a divorce is necessary to dissolve the marriage, in fact, nearly all believe that common law marriage and living in adultery are synonymous terms. If it were a *sine qua non* to the validity of such a union that the parties believe that a divorce is necessary to dissolve such a marriage (and a divorce is necessary as in any other marriage), then there are few if any common law marriages." *Koegel, Common Law Marriage,* 102. It was to some extent, indeed, upon the fact that "these loose and irregular contracts, as a general rule * * * are most generally founded in a wanton and licentious cohabitation," that marriages by agreement have been denied recognition as lawful by this

court. *Denison v. Denison,* 35 Md. 361, 381. The ordinary practice and preference, of women especially, that real union as man and wife shall be solemnized and certified beyond risk of question or suspicion, inevitably raises an expectation that, where there has been no such solemnization, and no effort to secure certification, it will be found that the full married relation has not been undertaken. And, lastly, the fact that contentions for legal common law marriages are scarcely ever heard of except in dubious demands for money from wealthy men or their estates—apart from the exceptional claims before the Bureau of War Risk Insurance —must cause hesitation in reviewing the evidence in another demand. In the light of knowledge of these practical conditions the burden of proof in this case seems to be a heavy one.

The case is that, during the settling up of the estate of a comparatively wealthy man, fifty-five years of age, who to all his relatives, friends and business associates, so far as appears, was known as an unmarried man, and had made his home with his mother, brothers and sisters in Baltimore, with no record anywhere of a marriage, a young woman of twenty-two comes forward with a claim that she had been married to him in New York, where he went once a week on business. Yet neither was she known to her relatives or familiars as married, except, perhaps, to a few in New York who were aware that she had been living to some extent with the decedent in a small apartment he had kept there. Of course, there is no certificate to be produced.

The complainant appears to have been since 1922 a member of various theatrical or musical organizations performing outside of New York, and she had spent two weeks in Baltimore in that year in a cabaret organization at the Century Theatre, in which the decedent was largely interested. After her last performance in Baltimore, at half past two in the morning, she, according to her own somewhat hesitant admission, went to a "shore" on Middle River near Baltimore, in a party of five or six, men and girls, and stayed there until the late afternoon the following day. She says she

thought the party was going to a country club. The party did not include the decedent. In March of 1923, the complainant's theatrical employment having come to a stop, she became employed in a dressmaking establishment of a Mrs. Gensburg in New York City. She stayed at a hotel at times and at other times stayed at the house of a friend in New Jersey.

The decedent was then a man fifty-four years old, living in Baltimore, as has been said, and engaged there in the management of moving picture and vaudeville theatres in which he was a large owner. It was his custom to go to New York on business every Monday afternoon, and to return to Baltimore on Wednesdays. He had procured himself a small apartment in New York, in an unpretentious building, and two of his business friends for a time had keys to it. And there was testimony of entertainments there, and testimony that young women lived there previously, two of them for periods of six months each. Complainant heard of the previous residence of these other young women there, but, contradicting another witness, says she heard of it only after the death of the decedent. To a considerable extent the complainant lived there during the last nine months before January, 1924, when decedent died. It seems impossible to say she lived there all the time, because of her putting up at a New York hotel frequently during that period, and because, in one of the decedent's letters which she preserved, he merely notified her that his brother would be using the apartment at a time mentioned, and directed her to introduce herself to the brother if she ran into him. The decedent regularly wrote her a short pencil note on Friday of each week during that period, each addressed to her at the apartment in the name of Claire J. Ulrich; and these notes the complainant preserved. They are abrupt, hurried, devoid of any indication of respect or marital attachment, sometimes lascivious, and worse. And when he went to New York on Mondays, as he regularly did, he gave her allowances of money.

On starting to prepare for substantiation of her claim, the complainant procured from a close friend, a Mrs. Stevenson, from complainant's home town in Pennsylvania, who had visited complainant in New York on the previous April 9th and 10th, 1923, a first statement, and then an ampler, second statement, to the effect that while Mrs. Stevenson was there the complainant announced to her that there would be an informal, private marriage between the complainant and the decedent on that night of April 9th, that the complainant was away from the hotel that night with the decedent, and that at lunch the next day the decedent said they had been married by a private ceremony and were going to live together as man and wife. A later third statement, adding that she had been with the pair at the apartment on the night in question, Mrs. Stevenson, advised by the men of her family, refused to give. As a witness Mrs. Stevenson was reluctant, or afraid to say anything, hesitating either to adhere to the statements she had given or to abandon them; but adhered to the statements finally, except that she testified that the decedent had said on April 10th only that the pair would be married in the future. Much of the decision of the case is rested on these statements of Mrs. Stevenson, and I am not able to see that they can be given that value. I do not see any reason for saying that Mrs. Stevenson tended more toward the truth in giving her statements than she did later in giving her testimony, or to accept any of her evidence as the stuff judicial decisions should be made of.

A statement procured from a Mrs. Wells, a New York friend of the complainant, declared that the decedent told her that the complainant was Mrs. Whitehurst now, and opened a credit for her in that name at Mrs. Wells' millinery establishment. But Mrs. Wells does not believe there had been any marriage, and the complainant admits that in response to Mrs. Wells' questions for confirmation she told her that she, the complainant, had a marriage certificate. The explanation given on behalf of the complainant is that she had in mind the prayer book produced later. A maid at the hotel, where complainant stayed, testified that, on leaving the

hotel somewhere about April 9th, 1923, the complainant said she was going away to be married, and the maid helped pack a trunk. The hotel records show that the complainant left the hotel on April 12th. A grocer near the apartment and his daughter testified to sales checks made out in the name of Whitehurst, and the daughter knew the complainant only as Mrs. Whitehurst, while her father knew her only as Miss Ulrich. And the keeper of a nearby cleaning shop testified that complainant gave the name of Whitehurst there, that gentlemen's garments had been left for cleaning, and that the witness thought a gentleman had come into the shop once with the complainant. A colored maid, who did work at the apartment, testified that the complainant was introduced to the maid by Mrs. Wells as Mrs. Whitehurst, and that the witness knew complainant only as Mrs. Whitehurst. And that evidence is attacked because the witness and the complainant were closeted together for three hours before the witness was examined. And finally there is the interpolated word "Wifey" in one of the decedent's letters. That word, the handwriting expert produced by the complainant was not able to attribute with entire confidence to the decedent. The expert testifying for the defendants attributed it to the complainant herself.

In the bill of complaint and earlier discussions of counsel, importance was attributed, on the complainant's behalf, to a letter of decedent's in which he referred to an approaching wedding. And in the bundle of letters preserved it is pinned to an envelope postmarked April 5th, 1923. But it also contains a reference to a meeting which the decedent was to attend in the west, and upon the taking of testimony it was shown beyond question that the meeting was held in May, and that the complainant's sister was married shortly after, in that month. The latter was then abandoned as evidence on the complainant's behalf, and there is no written word in any letters of an approaching marriage of the complainant.

There is much contradiction of the testimony just outlined, but, if it is all taken as true, I do not see on what ground it could be distinguished from such testimony to like effect

as would naturally arise from an intentionally illicit cohabitation, by reason of misconception or cautionary pretensions of the parties. It seems to me that even more might be expected, and that the lack of more could be explained only by the fact that the complainant kept her dwelling in the apartment a secret, as far as she could, a fact which is admitted.

It is thought that the prayer book mentioned in the bill of complaint, and exhibited during the taking of testimony, may be regarded as containing on its face a written agreement of marriage, and that, in connection with the evidence of a handwriting expert on the authorship of names written on the pages especially involved, the evidence of Mrs. Stevenson and other witnesses of complainant's statements of intention to marry the decedent, and the evidence of the decedent's reported later statements to Mrs. Stevenson and Mrs. Wells, it may be accepted as establishing the agreement of marriage contended for. The book is a small Roman Catholic prayer book of thin paper, which contains among other things forms and directions for celebration of marriages by a priest, and two pages containing directions for mixed marriages have the names Claire and Charles written upon them in pencil, in close proximity to the answers directed to be given by contracting parties to the priest's questions. One name is written in the wrong place. The handwriting experts differ almost altogether on the identity of the writer or writers, one testifying for the complainant that she wrote two names and the decedent wrote a third, while he was unable to form an opinion as to the authorship of the fourth, which was a second "Claire." And an expert for the defendants is of opinion that she wrote all four.

The question is one of possibly imitated writing, and the trial court had the advantage of demonstrations upon magnified copies, pointing out such indications as differences in the angles of the pencils or pens, and in the evenness or unevenness of pressure; and without these ocular demonstrations it is difficult to follow the testimony. And the judges, so far as they can rely upon their own unaided eyes, differ in

their impressions. The trial judge rejected the prayer book as unauthentic. It seems to me that a consideration of the circumstantial evidence should, however, solve all questions as to the value of the book.

It is somewhat difficult to say at the outset that a form for marriage ceremonies with only names written over it presents an agreement of marriage, or a declaration that the persons bearing those names had entered into an agreement of marriage, and intended to be legally married people. It seems to be reading into the book more than is actually there. But, however that doubt may be answered, it would seem strange that either party should have thought of such a method of becoming married if they really meant to be legally married. A common law wedding is not a familiar form of deliberate marriage. The woman in this case belonged to a church with well known requirements of marriage by a priest only. Its prayer book declares this, and the pages on which the names are written here are pages of directions for marriages by a priest. The decedent came from a state in which real marriages without religious ceremony are unknown, and so-called common law marriages are always illicit unions. *Denison v. Denison,* 35 Md. 361. And even for people who might be advised of the possibilities of common law marriages in New York, and might deliberately try to effectuate a really valid marriage by a common law method, this ceremony alleged would seem to be a strange one. People so intending would presumably seek to have such an important act witnessed or authenticated in some solemn way. It would seem unlikely that, if they thought well to make any record at all, they would adopt anything so ill-fitted as this as an expression of their solemn purpose and as the foundation of their future permanent status. At least a clear agreement, fully signed, would be expected, not first names only, written over cramped spaces and words on pages of a book not intended for any writing, and which will not even hold ink. And explain it as we may, the fact that this book, relied on as the record of a ceremony out of which the marriage arose, was not shown to the attorneys employed by the complainant to

establish that marriage until a year after the death of the decedent, and did not figure much in their plans, should cause hesitation to accept it as authentic. Such oversight does not ordinarily happen to the foundations of a suit. Thus there seems to be inherent improbability in the contention that this book presents a contract of marriage, or declares the parties married. And there are still undisputed facts in the case which—putting aside all disputed testimony against the complainant's claim—are opposed to it.

Here relatives of the parties were not told of any engagement or marriage. There was no engagement ring, and, although it is averred that a marriage was effectuated at a specific time and place, April 9th, 1923, there was no such thing as a holiday together, or other action signalizing a marriage at that time. The decedent returned to Baltimore as usual after that date, and the complainant, after an absence during that week, returned to work at Genzburg's dressmaking establishment for another week. The decedent did not set up a home for himself and wife according to his way of living. On leaving her hotel on April 12th, the complainant left as her mailing address that of her friend in New Jersey, and on leaving after subsequent stays at the hotel she never gave the apartment as her address. All of Whitehurst's notes to her were, as stated, mailed to the apartment, addressed to Miss Claire J. Ulrich. On April 18th she opened a personal bank account in New York in the name of Claire J. Ulrich, with an address at the apartment, and on November 11th, 1923, opened another in the same name at a different bank. Seven times during the period between April 12th, 1923 and January 30th, 1924, she returned to the hotel, and registered under the name of Claire J. Ulrich, and that was the hotel where, on leaving in April, she had, according to evidence introduced by her, stated that she was leaving to be married, when she gave orders as to mail on leaving the hotel, she directed it to be held. At the wedding of her sister in May, 1923, she signed as a witness in the name of Claire J. Ulrich. On a trip to Bethlehem, Pennsylvania, in July, to secure an appointment as guardian of

a young son of her godmother, she registered at a hotel as Claire J. Ulrich, and in that name signed and made affidavit to the papers. At Atlantic City, during the summer, she put up at one hotel under that name, while Whitehurst put up at another hotel. He was attending a convention. Coming to Baltimore during the last illness of the decedent, she registered at a hotel under the same name, and in calling up one of decedent's brothers announced herself as Miss Ulrich. And for a short period after the death of Whitehurst she received a weekly allowance from a New York attorney who was a friend of Whitehurst's always paid by check to Claire J. Ulrich.

It is argued for the complainant that much of this evidence, at least, may be explained by a desire of the parties to keep their marriage secret. Of course, a hidden fact and a fact which does not exist must leave much the same state of evidence. And it is conceivable that in states in which marriages might exist merely by agreement, without records or ceremonies, they might be kept secret and to the people surrounding the parties entirely unsuspected, or nearly so. But it would be unusual, and according to common experience unlikely. "There is," says 2 *Schouler, Marriage, Divorce, Separation and Domestic Relations,* sec. 1254, "a presumption against the validity of secret marriages." *Sorensen v. Sorensen,* 68 Neb. 483; *Heminway v. Miller,* 87 Minn. 123; *Bishop v. Brittian Inv. Co.,* 229 Mo. 699; *Jackson v. Jackson,* 80 Md. 176; *Koegel, Common Law Marriage,* 108 to 115. And if this presumption and inference should in a particular case happen to be wrong, the party contending for a married relation, but who had dispensed with all record of it, and has avoided the evidence of the married state which would ordinarily surround the life of parties who considered themselves married, cannot complain if a court fails to find the necessary proof. While a supposed desire for secrecy might explain a lack of evidence, it could not enable the court to find the fact without evidence. In this case, I think, quite apart from the disputed testimony on behalf of the defendants, there is a lack of sufficient evidence to support a finding of

the married relation, however that lack may be explained. It is, moreover, not clear that any plausible desire for secrecy could satisfactorily explain all the undisputed facts last recounted. There was no reason, for instance, for secrecy with the Genzburg family, who were intimate with the complainant, did not know the decedent or come in contact with any of his relatives or friends, and yet received no intimation of a marriage prior to the making of the present claim.

And there remains much testimony directly contradicting the facts which have been recited on the complainants behalf, which testimony, subject to attack as much of it may be on the ground of personal friendship for the decedent, or bias, cannot in my opinion be swept out altogether, without discrimination. That would be a simple solution of the difficulty, but not a judicial one, I think. There is testimony, for instance, of one business friend of the decedent that he happened to be in the apartment on the night of April 9th, 1923, which was on the day before his own wedding anniversary, and that no such ceremony or marriage arrangement as the complainant contends for actually occurred. If on the ground of probable bias we must disregard all such evidence as this, how can we consistently accept the statements which Mrs. Stevenson gave her friend, the complainant, in the preliminary preparations for supporting the claim, the statements now accepted as true. Then there is direct evidence of three witnesses of the complainant's tracing the word "Wifey" on the letter where it appears, from letters selected from the notes of the decedent; and testimony of the complainant's exhibiting her mother's old fashioned wedding ring as her own wedding ring. And there is much other evidence contradicting in details of greater or lesser importance the contentions urged for the complainant. It is useless to take it all up in detail here. I think there is far too much of it to permit acceptance of the contention that there was a common law marriage, a marriage intended by the parties to be a valid, legal union. And, finally, while the decedent cannot reply to the allegations of marriage now made, we have received in reliable form an indication of his

636

understanding of the relation that he had with the claimant. An attorney in New York, Mr. Sulzberger, not concerned in this case now, was consulted by the decedent shortly before his death on some question concerning the claimant, and this same attorney befriended the claimant later by giving her money out of his own pocket, and when she made the claim of a common law marriage placed her in the hands of a Baltimore attorney, one of the earlier attorneys employed. Mr. Sulzberger is given full credence by both sides as a witness to the few facts to which he was willing to testify. And while declining to give the conversation with the decedent, he did say that nothing ever said by the decedent permitted him to say that the claimant was his wife. And it may be added that this witness, too, said that according to the best of his recollection no such word as "wifey" was used in the letters from the decedent placed in his hands by the claimant.

The trial judge was, in my opinion, right in his finding that there was no marriage.

But there is another, and in some respects more serious difficulty confronting the complainant. She deliberately settled her claim. And to recover on that claim now she must have the court rescind and cancel the settlement on some one of the grounds which move a court of equity to take that action.

To the contention that the complainant was deceived in the settlement by being persuaded by Mr. J. Lieper Winslow, attorney for the Whitehurst family, as well as by her own attorney, that the paper by which she released her claim contained an acknowledgment that she was the widow of the decedent, I cannot see that much importance can be attached. There had been previous discussion, during negotiations of counsel in Baltimore, of requiring such an acknowledgment, but the suggestion had been rejected by counsel for the Whitehurst family. The contention that the complainant had been so deceived in the transaction in New York rests entirely upon her own testimony, and that is contradicted by Mr. Winslow and her own attorney. A charge against an attorney that he knowingly misrepresented the

contents of a paper which he presented for execution, for the purpose of procuring execution, when it would not otherwise have been obtainable, and did so in collusion with the signer's own attorney, is a serious one to make against an attorney, and one which could be judicially established as true only on clear, unmistakable proof. Mr. Winslow's evidence to the contrary is at least as clear and straightforward as the complainant's. Indeed, on this record it seems to me that it is impossible to avoid saying that the complainant's evidence appears altogether too untrustworthy to be accepted as the basis of any adjudication, for she exhibited herself as over-ready to supply evidence, and to shift her testimony, as occasion seemed to demand.

Avoiding illustrations of this from the excluded testimony on the marriage, these definite instances may be cited. In her bill of complaint, and to some lesser extent in the testimony, there was a contention that preparatory to the settlement she had been terrorized, by her counsel and an acquaintance of her own and of her counsel too, with tales of threatening danger from the Ku Klux Klan, and others antagonistic to her claim. When a Mr. Eisenberg, an attorney employed by her at an earlier stage of her case, was giving his deposition in New York as a witness to some facts on her behalf, he mentioned a trip to Baltimore with her to consult counsel retained there, and said he had a man, Harry Silverstein, who came into his office at times, go along. Explaining it, he testified: "I said, 'Harry, I have got to make a trip to Baltimore, and there is a young lady on the train, and I don't feel like travelling alone with young ladies, even if they are clients. Come along.'" And to confirm his recollection on this he asked the complainant, who was present at the taking of the deposition, whether the man named was with them. She answered then, "I think he went on the case." Yet this incident became, in the complainant's testimony in the trial court: "I was so scared about it when I came down to Baltimore the first time, the lawyer had a policeman with him and two revolvers in his pocket and he sat up all night and watched us in the berth * * * a big,

husky man that came down with us, and he watched us all night so nobody could get us in the train * * *. It was an armed guard we had. * * * Mr. Eisenberg was afraid to come from Brooklyn to Maryland without a revolver, and had two of them." And on a minor point, contradicting some other witnesses in New York, she persisted in saying that on the Saturday night before the death of decedent, upon receiving a telephone call from some one unknown, she came to Baltimore by the night train, registered at a hotel early Sunday morning, went to Sunday mass at the Cathedral, and spent the remaining days here up to the death on Wednesday. But the hotel register shows she arrived on Tuesday morning, the day after the decedent was expected in New York, but did not appear, and left Baltimore on the next day. And that was in accordance with the testimony of the New York witnesses. After acknowledging her signature on the register, her New York counsel asked if she had admitted it, and then she said she did not think it was her signature because she never signed her name that way. Yet she had signed many acknowledged signatures in the same form and letters, and, so far as appears to the naked eye, in exactly that particular hand. And if she did not sign that name, then she did not register at all at the hotel. There are other shifts and inconsistencies, on some of which the trial judge questioned her, and it is easy to understand, even without the advantage of seeing the witness while giving her testimony, that she would discourage any preference of it as a basis for a judicial finding, especially against straightforward evidence to the contrary.

But it seems to me, after all, to be unnecessary to dwell upon the unsafety of reliance upon her testimony that she was deceived by a representation by Mr. Winslow that the release acknowledged her to have been married to the decedent, because there are facts with which that testimony cannot be reconciled practically. The paper was brief, one page, of four short recitals and an agreement clause of twenty lines, all clearly typewritten, and it was in the com-

plainant's hands for some time for signing, and reading as much as she wished. There is no obscurity about the wording. In four paragraphs she is conspicuously named as Claire J. Ulrich, and she was required to sign as Claire J. Ulrich. It is not only difficult to suppose that she did not see for herself what the purport and effect of the paper were, but difficult to suppose, too, that any attorney would, if he were unscrupulous enough to do it, misrepresent the contrary in the face of that paper. Moreover, she was paid the $11,000 by a check endorsed to her in the name of Claire J. Ulrich. A finding of such misrepresentations on the part of the attorney has, in my opinion, far from sufficient foundation in the case presented. For these reasons I think there is no substantial ground of attack on the release.