# ADOLPH LANDO v. IDA LANDO.[1]

October 21, 1910.

Nos. 16,672—(207).[2]

**Validity of foreign marriage — proof of foreign law.**

Respondent, the father of David H. Lando, deceased, filed a petition for his appointment as administrator of the estate of his deceased son. Appellant, Ida Lando, whose maiden name was Oberg, appeared and objected to the appointment, claiming that she was the widow of the said deceased.

Deceased and appellant, residents of Minnesota, there exchanged mutual promises to marry in the future. Subsequently at Hamburg, Germany, they exchanged matrimonial consents before, and were pronounced husband and wife by, a man believed by appellant to be a minister of the Gospel. She then and at all times thereafter in good faith believed that she and said deceased were thereby married to each other. Thereafter, and up to the time of the death of the deceased, in Vienna, deceased and appellant lived and cohabited as husband and wife in Austria, held themselves out as husband and wife, and were reputed to be husband and wife among their friends and acquaintances in Vienna and in Minnesota. They never lived or cohabited as husband and wife in this state, or in any of the United States. There was no other marriage ceremony. The person who performed the ceremony in Hamburg was not a civil magistrate or registrar, and was not a person authorized by the law of Germany to celebrate a marriage between German subjects. It is *held:*

1. The validity of a marriage is to be determined by the law of the place where the ceremony is performed. A marriage regular where solemnized is valid everywhere. A marriage void where it is celebrated is void everywhere. The validity of the marriage here in question was determined by the law of Germany then in force.

2. A foreign law is a fact, which must be pleaded and proved like any other fact. This court does not take judicial cognizance of the German law applicable to this case.

---

[1]Reported in 127 N. W. 1125.　　　　　[2]April, 1910, term calendar.

---

[Note] Conflict of laws as to validity of marriage, see note in 57 L.R.A. 155.
. 112 M.—17.

**Effect of stipulation as to foreign law.**

It was stipulated that such German law was correctly translated as follows:

"Art. 13. The contraction of a marriage (otherwise translated 'entering into'), even if only one of the parties is a German, is determined in respect of each of the parties by the laws of the country of which he (or she) is a subject (otherwise translated 'to which each respectively belongs'). The same rule applies to an alien who concludes a marriage within the empire * * * The form of a marriage which is concluded within the empire is determined exclusively by German law." That stipulation concerned a matter which is here of fact and not of law.

Neither the construction of the German code as a whole, nor the relevant authorities, determine the construction to be placed on this equivocal translation.

The literal significance of the terms of the translation leads to the construction that, under the first paragraph of the article, the deceased and appellant were aliens who had concluded "a marriage within the empire;" that such marriage was determined by the law of the country of which they were subjects; that, the parties being residents of Minnesota, the attempted marriage was governed by the law of that state; and that the last paragraph is a direction to German officials as to the manner in which they must celebrate marriages in Germany between German subjects.

**Presumption of validity — evidence.**

When a marriage has been shown in evidence, whether regular or irregular, the law raises a strong presumption of its legality; not only casting the burden of proof upon the persons objecting, but requiring them throughout, to make plain, against the constant pressure of this presumption, the truth of law and fact that the marriage was irregular and void. The evidence to repel that presumption must be strong, distinct, and satisfactory.

**Marriage valid in Minnesota.**

In view of this presumption, the translated law as stipulated is *held* to have been satisfied by this marriage, valid under Minnesota law.

Adolf Lando appealed to the district court for Ramsey county from an order of the probate court for that county denying his petition for his appointment as administrator of the estate of his son, David Herman Lando, who died in Vienna, Austria, in May, 1908. In the district court it was ordered that the petition for his appointment should stand for a complaint and Ida Lando have leave to answer. Her answer admitted that deceased was a resident of the

County of Ramsey at the time of his death, and that petitioner was the father of deceased; denied that his father and mother were his heirs at law and alleged that she and the deceased were married on September 25, 1907, and from that time lived as husband and wife, and that defendant was his widow and sole heir. The reply denied the new matter alleged in the answer.

The appeal was heard before Bunn, J., who reversed the order of the probate court. From this order, defendant appealed. · Reversed and remanded, with directions to the trial court to amend its conclusions of law and to enter judgment for appellant.

The stipulation referred to in the opinion agreed "that the German law which was in force from September 21, 1907, to May 19, 1908," so far as thereto applicable, was correctly translated in the schedule attached to, and made a part of, the stipulation; and it was agreed that such schedule "subject to the qualifications and reservations hereinafter expressly made may be received and read in evidence upon the trial of this proceeding with the same force and effect as though the provisions of law therein referred to were proven in the usual form by a duly-authenticated copy of the civil code of Germany and its laws governing marriage in force on and between the dates above mentioned. This stipulation is made for the purpose of obviating the necessity of calling a witness learned in the German law and of producing a duly-authenticated book or other copy of the German law, and is subject in other respects to all the objections which might otherwise be urged with respect to the competency, relevancy, materiality, and general admissibility of the said evidence. In connection with this stipulation the court may refer, if it so desires, to the text of the said 'Buergerliches Gesetzbuch' as found in said book." (Two editions of which had been particularly described and identified in the stipulation.)

*Young & Stone* and *Otto Kueffner,* for appellant.

*Harris Richardson, Harold C. Kerr* and *Hiram D. Frankel,* for respondent.

JAGGARD, J.

The respondent, Adolf Lando, filed a petition in the probate court

of Ramsey county for his appointment as administrator of the estate
of his son, David H. Lando, deceased. The appellant, Ida Lando,
appeared and objected to the appointment, claiming that she was
the widow of deceased. On appeal to the district court, the essential
issue was tried and determined, namely, whether David H. Lando
at any time during his life married the appellant. If she was his
legal wife, she is entitled to appointment as administratrix, and
under the intestate law to the property of the deceased; if she was
not his wife, the respondent is entitled to administration, and the
family of the deceased to inherit his estate.

The deceased, at the time of his death and for many years prior
thereto, had been a resident of the city of St. Paul, Minnesota, and
engaged in the practice of medicine and surgery therein. The ap-
pellant, whose maiden name was Ida Oberg, is twenty-seven years
of age, was born in Sweden, but has resided in St. Paul since early
childhood. She had been a trained nurse, and associated with Dr.
Lando in that capacity. In September, 1907, the doctor and the
nurse left separately for New York, but sailed on the same ship to
Hamburg.

The trial court was not only justified in finding, but was required
by the evidence to find, that "on the twenty-fifth day of September,
at Hamburg, Germany, they exchanged matrimonial consents before,
and were pronounced husband and wife by, a man believed by
respondent to be a minister of the Gospel. Respondent then, and
at all times thereafter, in good faith believed that she and said David
Herman Lando were thereby married to each other." Cohabitation
followed. The wedding ring and the watch, with the initials thereon,
which the doctor gave her, were significant of that relationship. The
parties then left for Berlin and went to Vienna. The doctor renewed
his studies at the Viennese general hospital under the patronage of
the distinguished surgeon Baron von Eiselberg, who entertained the
doctor and appellant as his wife. The evidence is abundant that
they lived together openly as husband and wife, and were reputed
to be such in Vienna.

It is true that while the parties were in New York a St. Paul
newspaper published an account of their marriage in New York.

Dr. Lando wrote from Vienna, demanding a retraction of all these statements. There was also evidence, however, that he wrote to a friend in America: "In my endeavor to become quietly married, the newspaper furore was intense, and I now regret that we did not announce our intentions before reaching New York. It would have sufficed to keep a great many mouths shut. If I had ever known that a quiet marriage would have produced so much uncalled-for comment, I would have been married in the open space at Seven Corners before a public crowd."

The record contains an abundance of letters written by the deceased in his life which refer to appellant as his wife. He sent to the University of Minnesota an application for the position of professor of surgery, in which he stated that he was married.

The trial court properly found: "The respondent and said David Herman Lando, at St. Paul, Minnesota, prior to September 25, 1907, exchanged mutual promises to marry in the future. * * * From and after September 28, 1907, up to the time of the death of David Herman Lando, he and respondent lived and cohabited as husband and wife in Vienna, Austria, and held themselves out to be husband and wife, and were reputed to be husband and wife among their friends and acquaintances in Vienna, Austria, and in Minnesota. They never lived as husband and wife or cohabited in this state, or within any of the United States." The trial court also found, and was required by the evidence to find, that the marriage was not performed by any person authorized by the law of Germany to perform the celebration of a marriage. The learned trial judge thereupon concluded as matter of law that respondent never was the wife of David H. Lando, deceased, is not his widow, and is not entitled to letters of administration.

1. The validity of the marriage is to be determined by the law of Germany, where it was celebrated. It is a generally accepted principle of interstate and international law that the validity or invalidity of a marriage is to be determined by the law of the place where the ceremony is performed; that a marriage legal where solemnized is valid everywhere; and that a marriage void where it is celebrated is void everywhere. If the law of the place of trial

were to control, a marriage might be valid in one state and invalid in another. It is obviously essential to the welfare of mankind that a marriage valid in one place should be valid everywhere. In Hills v. State, 61 Neb. 589, 85 N. W. 836, 57 L.R.A. 155, most of the cases will be found analyzed. And see McHenry v. Bracken, 93 Minn. 510, 101 N. W. 960; Garcia v. Garcia (S. D.) 127 N. W. 586. Cf. Schuster, Principles of International Law, p. 481.

This rule applies to cases where the parties attempting to marry are mere sojourners in the place where the marriage ceremony is claimed to have been performed. State v. Shattuck, 69 Vt. 403, 38 Atl. 81, 40 L.R.A. 428, 60 Am. St. 936; Com. v. Lane, 113 Mass. 458, 18 Am. Rep. 509; Van Voorhis v. Brintnall, 86 N. Y. 18, 40 Am. Rep. 505; Ex parte Chace, 26 R. I. 351, 58 Atl. 978, 69 L.R.A. 493; True v. Ranney, 21 N. H. 52, 53 Am. Dec. 164. But see, contra, In re Stull, 183 Pa. St. 625, 39 Atl. 16, 39 L.R.A. 539, 63 Am. St. 776; Pennegar v. State, 87 Tenn. 244, 10 S. W. 305, 2 L.R.A. 703, 10 Am. St. 648.

2. The decisive question in the case is whether the parties were married in accordance with the German law. The court does not take judicial cognizance of the law on this point. It is elementary that foreign laws must be pleaded and proved like any other fact. 9 Enc. Pl. & Pr. 542; 3 Words & Phrases, 2886; 10 Current Law, 1174, note 15; Hoyt v. McNeil, 13 Minn. 362 (390); Crandall v. Great Northern Ry. Co., 83 Minn. 190, 86 N. W. 10, 85 Am. St. 458; Myers v. Chicago, St. P., M. & O. Ry. Co., 69 Minn. 476, 72 N. W. 694, 65 Am. St. 579; Thomson-Houston Ele. Co. v. Palmer, 52 Minn. 174, 178, 53 N. W. 1137, 38 Am. St. 536; R. L. 1905, §§ 4698, 4701. Cf. sections 2691, 4766.

In this case it was stipulated between the parties "that the German law, which was in force from September 21, 1907, to May 19, 1908, so far as here applicable, is correctly translated by and in the 'Schedule' which is hereto attached, hereby referred to and expressly made a part of this stipulation, the same * * * [which] may be received and read in evidence upon the trial of this proceeding with the same force and effect as though the provisions of law therein referred to were proven in the usual form by a duly authenticated

copy of the civil code of Germany and its laws governing marriage in force on and between the dates [here involved]." This schedule set forth a number of provisions of the German code relative to marriage, and in particular [from the act introductory to the code] this stipulated translation:

"Art. 13. The contraction of a marriage (otherwise translated 'entering into'), even if only one of the parties is a German, is determined in respect of each of the parties by the laws of the country of which he (or she) is a subject (otherwise translated 'to which each respectively belongs'). The same rule applies to an alien who concludes a marriage within the empire.

"In respect to the wife of an alien declared dead under article 9, par. 3, the conclusion of a new marriage is determined by German law.

"The form of a marriage which is concluded within the empire is determined exclusively by German law."

(The original German words for the contraction of a marriage at the beginning of the first paragraph are "Die Eingehung der Ehe;" for "who concludes a marriage," at the end of that paragraph, are "eine Ehe eingehen.")

The proper interpretation of the provision abounds in doubt and uncertainty. That the original language, properly translated and interpreted in the light of the code construed as a whole, is a clear and consistent provision is most highly probable. That code was prepared with the greatest care and the most consummate skill. "Unlike the Code Napoleon," says Mr. Chung Hui Wang in the introduction to his translation, "the German Civil Code is the most carefully worded and scientifically arranged code extant, representing no less than twenty-two years of careful study and research by the most eminent German jurists." The late Professor Maitland referred to it in his Political Theories in the Middle Ages, § 17, as being "the most carefully considered statement of a nation's laws that the world has ever seen;" while Dr. A. Pearce Higgins speaks of it as being "a standing object lesson to all states that are looking forward in the future to a scheme of codification."

The present controversy, however, does not concern the correct

philological interpretation of the original language. The question comes before this court restricted by the stipulation. The parties have agreed that the translation is correct. Counsel for appellant insists upon the limitations which the translation imposes. That stipulation concerns a matter which is here of fact and not of law. We must respect it. We are therefore not called upon to decide the abstract or general question, but the particular question of the interpretation of the statute as thus translated. We are not called upon to consider what the law meant in the German language in which it was formulated, but what is the signficance of the English words into which it has been correctly translated.

One possible construction is that, under the first paragraph of this article, Dr. Lando and Ida Oberg were "aliens who had concluded a marriage within the empire;" that such marriage was determined with respect to "each party" by the laws of the country of which (he or she) was a subject (or to which each respectively belongs) ;" and that each of these parties belonged to America, and were therefore governed by American laws, under which the attempted marriage was undoubtedly valid. In this view, the last paragraph is a consistent direction to German officials as to the manner in which they must celebrate a marriage in Germany between German subjects. For this view appellant contends.

Another possible construction is that the form of a marriage concluded in Germany is always governed by the German law; that the first paragraph of this article refers, not to the formal celebration of a marriage, but to the capacity of the parties to enter into a contract of marriage (that, in other words, the first paragraph refers to 'the contraction,' 'the entering into'—has to do with the impediments to marriage; the last paragraph with the ceremony) ; and that the attempted marriage, in this case confessedly not in conformity with the German form, was not a marriage in law. For this view respondent contends.

Neither construction is clear nor free from objection. Neither party has satisfactorily answered the consideration urged by the other; and this is no fault of either counsel. It is necessarily the situation. The German code must be construed as a whole, in order

that the doubt may be resolved. We have considered the arguments of counsel in this connection, and have made our own independent investigation into other and related parts of the code. The result, restricted as it must be by the stipulation, is not significant and does not substantially tend to determine the controversy.

The authorities on this subject, which the exceptional industry of counsel in their briefs have exhausted, are not in themselves cogent. Their consideration of the particular controversy before this court is not direct. See, for example, Mr. W. W. Smithers' valuable article in 41 Am. L. Reg. (N. S.) 685, 42 Am. L. Reg. (N. S.) 14, 26; 33 Am. L. Rev. 396–399; 35 Am. L. Rev. 190–202; 4 Can. L. Rev. 372–378; 1 Annual Bulletin Comparative Law Bureau, American Bar Assn. 36–38. Nor are any authorities to which respondent refers us founded upon the necessary condition of this opinion, namely, the correctness of the translation previously set forth. It is therefore immaterial, for example, that Dr. Schuster deplores that Dr. Wang did not refrain from coining new expressions in his translation, some of which were eminently calculated to mislead English readers. Dr. Schuster's interpretation of this part of the German law does not discuss the inconsistency in the translation of article 13 here urged by counsel, and does not proceed upon the hypothesis which controls this case. Compare page 482, § 409, and subd. 5, page 490, with note 15, page 89. And see Meilie's International Law, 173–177, 212, etc. No clear, convincing, or satisfactory conclusion is justified by the authority on the subject.

The historical argument on this section tends to confirm appellant's view. Compare section 41, German Statute of 1875, with article 13; and see 42 Suffert's Archives, 303. The appellant is not without some, but inconclusive, authority. See Kent v. Burgess, 11 Simons, 361; Newbury v. Brunswick, 2 Vt. 151, 161, 19 Am. Dec. 703; 2 Beal's Cases, 103; Bar's International Law, 358–361; Ruding v. Smith, 2 Hag. Con. 371; Bishop, Marriage, Divorce & Separation, 360; 1 Wharton, Law of Evidence, § 83, p. 81.

The natural and literal meaning of the translation is that for which appellant contends. These parties were in fact aliens who had concluded a marriage within the empire. The words of the

first paragraph declare that they should be governed by the law of their own state. Neither the words "capacity to contract," nor "impediments to marriage," nor any equivalent expression, appear in this paragraph. The language used does not purport to deal with competency to marry. On the contrary, it expressly and in appropriate terms concerns the conclusion of a marriage. To sustain respondent, new terms must be introduced or substituted by construction. No legal justification for such a construction appears.

The primary rule of interpretation, which we regard as controlling in this situation, is the familiar one, "Semper praesumitur pro matrimonia." "Every intendment of the law leans to matrimony," says Mr. Bishop, Marriage, Divorce & Separation, 956. "When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a strong presumption of its legality—not only casting the burden of proof on the party objecting, but requiring him throughout in every particular to make plain against the constant pressure of this presumption the truth of law and fact that it is illegal and void.   *   *   *  It being for the highest good of the parties, of the children, and of the community that all intercourse between the sexes in form matrimonial should be such in fact, the law, when administered by enlightened judges, seizes upon all probabilities, and presses into its service all things else which can help it, in each particular case, to sustain the marriage, and repel the conclusion of unlawful commerce."

In Piers v. Piers, 2 H. of L. Cas. *331, there was a well-known declaration that "the question of the validity of a marriage cannot be tried like any other question of fact which is independent of presumption, for the law will presume in favour of marriage," and it is to be remembered that in this case the foreign law was a question of fact and not of law. Lord Chancellor Cottenham said: "My Lords, I have not found that the rule of law is anywhere laid down more to my satisfaction than it is by Lord Lyndhurst in the case of Morris v. Davies, as determined in this House. It is not precisely the same presumption as exists in the present case, but the principle is strictly applicable to the presumption which we are considering.

He says: 'The presumption of law is not lightly to be repelled. It is not to be broken in upon or shaken by a mere balance of probability. The evidence for the purpose of repelling it must be strong, distinct, satisfactory, and conclusive.' No doubt, every case must vary as to how far the evidence may be considered as 'satisfactory and conclusive'; but he lays down this rule that the presumption must prevail unless it is most satisfactorily repelled by the evidence in the cause appearing conclusive to those who have to decide upon that question." The celebrated Lord Brougham said in the same case, on p. *369: "I should say, 'clear, distinct and satisfactory evidence.' I am not quite prepared to use the word 'conclusive.' I think some doubt may arise upon that, which it is unnecessary to raise, because, if the evidence required be clear and satisfactory, that is quite sufficient for me. I do not like ever to lay down the rule that evidence must be 'conclusive,' because that gives occasion very frequently to needless and inconvenient doubt."

There is much more and familiar authority to the same effect.

In the case at bar the evidence of an attempted marriage and of a marriage valid under the laws of this state is certain and plenary. This woman believed, and under the laws of nature and under the laws of this state was justified in believing, that this man was her lawful spouse; that their intercourse was hallowed as between husband and wife, and not prostituted as between libertine and wanton; and that possible offspring would be legitimate, and not bastardized. It does not seem to us justifiable for the law, despite this presumption, to impose an uncertain construction upon this foreign law which would brand the dead with betrayal and the living with dishonor. We are unable to perceive why the presumption of validity of an attempted marriage should be denied to these parties both innocent of moral wrong, and the presumption of innocence extended to the most confirmed recidivist. Certainly the considerations relied upon to repel that presumption are not clear nor satisfactory, nor at all conclusive. We are therefore constrained to hold that the marriage in question, conforming as it did to the Minnesota law, conformed also to the German law as its translation has been here agreed upon.

It follows that the judgment must be reversed, and the cause

remanded, with directions to the trial court to amend its conclusions of law, and to enter judgment for appellant in accordance with this opinion. So ordered.

O'BRIEN, J., being of counsel, took no part.