## CHARLESTON.

HALL *et al.* v. BAYLOUS.

(No. 6569.)

Submitted February 18, 1930.   Decided March 4, 1930.
(Rehearing Denied May 31, 1930.)

2

*James H. Strickling* and *Poffenbarger & Poffenbarger*, for plaintiff in error.
*Vinson, Thompson, Meek & Scherr*, for defendants in error.

Woods, Judge:

This action of unlawful entry and detainer was instituted in Cabell county by the heirs of William T. Hall, deceased, to recover possession of the mansion house, which the defendant sought to hold, pending an award of dower, on the theory that she was the legal widow of decedent. The defendant brings error to a judgment adverse to her.

It appears that an absolute divorce was granted Gertrude Baylous (defendant herein) from her husband, Walter S. Baylous, by the domestic relations court of Cabell county, December 19, 1927. Said decree, in accordance with section 14, c. 64, Code, forbade plaintiff from marrying any other party, except Walter S. Baylous, for a period of six months. On April 21, 1928, however, she was married in the city of Charleston to William T. Hall, who later departed this life on August 19, 1928, possessed with certain property, including the mansion house, heretofore mentioned.

The question presented for determination on this writ is, was Gertrude Baylous the wife of the decedent, Hall? This fact depends upon whether the alleged marriage to him was void, or merely voidable. What is void can always be assailed in any proceeding; what is voidable can be assailed only in a direct proceeding instituted for that purpose. A determination of this question involves the interpretation of section 14, c. 64, Code, which is as follows: "Neither party to a divorce suit shall again marry within six months from the date of a decree of divorce; but this provision shall not apply to, or prohibit the divorced parties from being remarried to each other at any time. The court may further prohibit the guilty party

from marrying within a certain time, to be fixed in the decree, not to exceed five years from the date of the decree; and any marriage contracted by the parties, or either of them, except a remarriage by the divorced parties to each other, within the prohibited period, shall be void, and the party shall be criminally liable the same as if no divorce had been granted. The court may at any time after the expiration of one year, modify the restraint imposed upon the guilty party, upon it being shown that such person, by reason of his or her life and conduct, since the date of the decree, is entitled to such relief." This section was added by the Legislature in 1915.

Counsel for appellant contends that the tendency of modern civilization is to condemn the doctrine of ab initio nullity of marriages; and to make forbidden marriages voidable only, and then only by a sentence or judgment of a court; and that the legislation in this state is in line with this tendency. Many of the cases cited from foreign jurisdictions involve statutes containing no words of nullity. Such cases obviously lend no aid in determining the question at issue here. Inasmuch as the Legislature has full control of the subject of marriage, and fixes the conditions under which the marital status may be created or ended, such legislation may be altered by statute. Whether a marriage of the kind under consideration should be treated as entirely void, or should be open to attack only in specific proceedings brought by certain persons, is purely a question of policy for the Legislature. The particular section, in so far as the question here presented is concerned, has not been interpreted by this court. However, its constitutionality was upheld in *State* v. *Snyder,* 89 W. Va. 96, 108 S. E. 588. So the question raised is one of first impression.

The general rule is stated in 19 Corpus Juris, p. 183, as follows: "A remarriage contracted within the state by a divorced party within the period, in which by statute remarriage is prohibited, is, as a rule, void, although it has been held, that where the statute merely prohibits remarriage by a divorced person within a specified time, but does not in terms declare such marriage shall be void, the marriage is not void but voidable only." Bishop (I Bish. Div. & Sep. § 435) lays down the rule: "Unless statutes creating impediment in the way of

marriage contain express words of nullity, marriages contracted in violation thereof are not void, and at most voidable.'' This same doctrine is announced in Stewart on Marriage & Divorce, §§ 703-708.

The statute here under construction does contain a word importing a nullity. A restriction similar to ours was placed upon the marriage of divorced parties by the Legislature of Oklahoma. There it was declared to be unlawful in any event for either party to a divorce suit to marry another person within six months from the date of such decree of divorcement, and that any person marrying contrary to the provisions of such statute should be deemed guilty of bigamy, and such marriage deemed absolutely void. The appellate court of that state has held that a marriage contrary to such statute is void ab initio. *Harvey* v. *State*, 31 Okl. Cr. 299, 238 P. 862, 51 A. L. R. 321; *Niece* v. *Territory*, 9 Okl. 535, 60 P. 300; *Atkeson* v. *W. O. W.*, 90 Okl. 154, 216 P. 467, 32 A. L. R. 1108.

A similar statute received a like interpretation in Kansas, Oregon, and Washington. *Durland* v. *Durland*, 67 Kan. 734, 74 P. 274, 63 L. R. A. 959; *McLennan* v. *McLennan*, 31 Or. 480, 50 P. 802, 38 L. R. A. 863, 65 Am. St. Rep. 835; *Smith* v. *Fife*, 4 Wash. 702, 30 P. 1059, 17 L. R. A. 573. Counsel for appellant stresses the effect of the words ''absolutely void'' in the Oklahoma statute. This, to our mind, is unimportant. Where an act is declared void, nothing can be added thereto by way of qualification. Of course, where the whole statute would leave the matter in doubt as to what was intended, words of qualification might be useful in ascertaining the intent of the Legislature. The main case relied on by the appellant is that of *Harrison* v. *State* (decided in 1864) 22 Md. 468, 85 Am. Dec. 658. There the validity of a marriage of persons within the prohibited degree of consanguinity was involved. The statute (Act Md. 1777, c. 12, § 1) provided: ''That if any person within this state shall hereafter marry with any person related within any of the degrees of kindred or affinity expressed in the following table such marriages shall be void''—the relation of uncle and niece being included in such table, that being the relationship to each other of the parties to the marriage in question. By the same act all marriages of persons related in

the prohibited degree of consanguinity celebrated in the state *theretofore* were confirmed and made valid for all intents and purposes from the time of the celebration thereof. In view of this contemporaneous legislation, the court held there that the marriage under the statute was not necessarily meant to be void ab initio, but only from the time that its nullity was pronounced by a court of competent jurisdiction. The court in its opinion called attention to the fact that a different construction of the statute would have the effect of bastardizing the children of such marriage, and was therefore so pregnant with serious consequences as not to be adopted without the most cogent and conclusive authority. In this state, however, we have a statute legitimatizing such issue. The court discussed canonical disabilities such as render the marriage voidable and not void—the class to which the marriage under review there belonged—and contrasted such disabilities with those civil in nature arising from want of capacity to contract, whereby the marriage is avoided ipso facto, without the aid of a court. Learned counsel for appellant, while admitting that such distinction was so made in the opinion, contends that the decision was not based on that. It is patent, however, that in the case at bar we are dealing with civil disabilities alone.

Keeping in view the foregoing principles announced by the text-writers and decisions, let us turn to a consideration of the legislation relative to the subject at hand. The public policy of this state, as well as that of all others, so far as we know, is to foster, protect, and encourage marriage, as it is the foundation of the family relation, without which, as an observation of the history of the human family shows, there can be no civilization. The state is likewise vitally interested, once the marriage state is formed, in the permanency of that relation, and its interest finds expression in the various statutes which prescribe the grounds for which divorce may be granted. So great is this interest that this court has held that the state is an implied party to all suits for divorce, and that the courts must take care and in some way see that divorces are not granted contrary to law, or by suppression of evidence, collusion of parties, or by other methods or for the other purposes, in violation of law. *Wass* v. *Wass,* 41 W. Va. 126, 23 S. E. 537. Suits for divorce

became more and more frequent until it culminated in legislation in 1915 (Acts 1915, c. 73), entirely changing our procedure in such cases. Instead of being tried alone as suits in chancery, as theretofore, it was provided that they should be tried before the court in chambers and all witnesses required to appear and testify at the trial the same as witnesses in actions at law. A divorce commissioner was required to be appointed by the circuit court, whose duty it was to appear at such trials and defend the interests of the state by bringing before the court all witnesses to develop the true facts and generally take all necessary steps to prevent fraud and collusion. As an alternative, the court was authorized to refer the case to a commissioner in chancery, or a special commissioner, to take and return the testimony, with a report upon all such facts that the court might require.

The dominant idea of the foregoing legislation is to secure the sanctity of divorce trials and the integrity of testimony on which the rights of the parties to the litigation are determined. Along with these changes came the enactment of the provision under review here concerning remarriage. Its rigorous terms plainly indicate the evil sought to be corrected. This provision serves a double purpose: First, that of securing a reconciliation between the parties and a reassumption on their part of the marital relation; and, second, to prevent hasty remarriages with third persons—an unseemly practice all too prevalent for the well-being of society. The need for the amendatory legislation just recited was sensed by the circuit judges of the state and voiced by them in a state-wide meeting and the state Legislature (1915), later memorialized by them through a committee of their number appointed for the purpose.

Section 1, c. 64, Code, which was taken from the Virginia Code of 1860, provides: "All marriages between a white person and a negro; all marriages which are prohibited by law on account of either of the parties having a former wife or husband then living; all marriages which are prohibited by law on account of consanguinity or affinity between the parties; all marriages solemnized when either of the parties was insane, or incapable from physical causes of entering into the marriage state, or under the age of consent, shall, if solemnized

within this state, be void from the time they are so declared by a decree of divorce or nullity." It is contended by the appellant that this section, when considered in relation to the law existing at the time of its adoption, clearly evinces a policy on the part of the state to wipe out the harsh doctrine of absolute invalidity of prohibited marriages; and the substitute therefor of voidableness, making them valid in all respects until ended in a particular and specific manner; and that the same remains the policy of the state until changed by the Legislature. But is not section 14 a declaration of public policy? The public policy of today may not be the public policy of tomorrow. The notion as to what is injurious to the public welfare at one time may not accord with the notion of a succeeding generation. In the language of Justice Field of the Supreme Court of the United States: "There can be no public policy which contravenes the law of the land." As already indicated, the policy of our state has been to *promote* marriage as an institution. But what brought about the passage of section 14 in 1915? In order to interpret the legislative intent, we have a right to look to conditions as they existed at that time. Conditions had changed a great deal within the half century immediately preceding, as we have already shown. Divorces had become very prevalent. The marriage bond was becoming more and more unstable. So the act of 1915 (Acts 1915, c. 73) was passed.

In view of the foregoing, just what did the Legislature mean by the use of the word "Void"? Did it mean that the attempted marriage in violation of the section should be void absolutely, and amount to nothing more than a mere form, or did it mean that such act was merely "voidable"? Assuming for the moment that it meant "voidable," what would be the effect of the statute? Would it tend to protect the marriage status? To accomplish such result, the six-month period must be kept open in order that the divorced parties may remarry at any time within such period. If either were permitted to marry a third person within such time, a reunion of the original parties would be impossible without a court proceeding to declare the ceremony with the third person void. True, by section 1 of the act, the prohibited marriages therein embraced are to be void from the time they are so declared by

a decree of divorce or nullity. Section 14 was enacted in view of such section. So the mere fact that the Legislature acted in the light of said provision gives force to the argument that the particular marriage prohibited by the latter section was meant to be void ab initio, for, had it been the intention to put the marriage there prohibited in the class enumerated in section 1, it would have added words signifying such intention. In both sections the subject of forbidden marriages was dealt with. The Legislature must be presumed to know the language employed in former acts, and, if in a subsequent statute on the same subject it uses different language in the same connection, the courts must presume that a change of the law was intended. 25 R. C. L. p. 1051. The later statute in express, unmistakable words declared that a marriage in disobedience thereto shall be void. It went further and penalized the participants in such marriage to the extent of making them criminally liable. Where a statute provides that a particular act shall be void, and fixes the penalty for the perpetration of the act, which is also prohibited, the word ''void'' shall be interpreted as meaning void absolutely, in accordance with the technical accuracy of the word. *Land, Log & Lumber Co.* v. *McIntyre,* 100 Wis. 245, 75 N. W. 964, 69 Am. St. Rep. 915; Endlich Int. Stat., § 270; Maxwell, Int. Stat. (3d Ed.) 297. According to all lexicographers, the word ''void'' means of no effect whatever; of no legal force or effect. Many courts hold that it does not at all times mean void for every purpose when used in a statute; the cases so holding, however, do not controvert the rule that in so determining whether it is or not, regard must be had to the subject-matter of the statute, and its scope, purpose, and effect—a rule of general application in interpreting statutes. Familiar rules of interpretation must necessarily play an important part in reaching correct conclusions, such as a consideration of the evil sought to be corrected. So we start with what must be conceded, that the primary and strictly accurate meaning of the word ''void'' is that of absolute nullity. Void things are as no things. Admitting that the decisions are in confusion and that the word ''void'' used in the statutes may be interpreted as ''voidable,'' all decisions are in accord that, where the intent of the lawmakers can be ascertained by use of well-

known rules of constructions, the word should always receive its natural force and effect.

At the risk of repetition we call attention to the clear-cut language of the statute: "And any marriage contracted by the parties, or either of them, except remarriage of the divorced parties to each other, within the prohibited period shall be void, and the parties shall be criminally liable *the same as if no divorce had been granted.*" The words which we have italicized are significant in determining the meaning of the Legislature. In fact, the statute admits of a construction that the divorce is full and complete for all purposes, excepting that neither party shall enter into a marriage with any other person during the specified time, and during which period the decree of divorce is suspended and inoperative to that extent. A construction of the statute which would permit a marriage within the time limited would not only be contrary to the plain wording and evident intent, but would in effect permit the anomalous result of one person having two legal husbands or wives, as the case may be, at the same time. Public policy alone would forbid such a construction. But whether it amounts to that or not, under the plain letter of the statute, or tested by the well-recognized rules of construction, heretofore referred to, we are of opinion that any marriage contracted in violation of the provisions therein is void and of no effect.

The further point is made that, inasmuch as the parties to the marriage in queston continued to live together as husband and wife, after the expiration of the prohibited period, a presumption of a valid marriage after the expiration of said period arises. The following provision of the Code, c. 64, § 4, dealing with the affirmation or annulment of marriages, is relied on: "In every such case, and in every other case where the validity of a marriage is called in question, it shall be presumed that the marriage is valid, unless the contrary be clearly proven." Since we have concluded that the marriage of April 21, 1928, was void, the effect of cohabitation begun thereunder becomes material. The presumption is that a connection which was without the realm of the law in the beginning continues so. *Clayton* v. *Wardell,* 4. N. Y. 230; *Ferrall* v. *Broadway,* 95 N. C. 551; *Thompson* v. *Thompson,*

114 Mass. 566. But this presumption is not conclusive. The rule amounts to this, that evidence of a change in the relations is necessary where the connection was unlawful at first, and that a mere continuance of cohabitation will not raise a presumption of marriage. Note, 14 L. R. A. page 364. The New Jersey Court of Errors and Appeals in a well-considered case held that continued cohabitation by persons in contravention of the statute forbidding marriage within a specified time will not establish even a valid common-law marriage. *Collins* v. *Voorhees,* 47 N. J. Eq. 555, 22 A. 1054. A similar doctrine has been announced and applied by the Supreme Court of Wisconsin. *Lanham* v. *Lanham,* 136 Wis. 360, 117 N. W. 787, 17 L. R. A. (N. S.) 804, 128 Am. St. Rep. 1085. But the appellant rejoins that in none of the foregoing cases is the statutory rule of presumption involved as in the instant case. But, giving to this rule its broadest effect, has not the contrary been proved? The validity of the April marriage was directly called into question. It has been shown to be invalid. It is not contended that the cohabitation after the prohibited period was under any other marriage. On the contrary, the agreed state of facts stipulates ''that pursuant to said marriage ceremony, the said Gertrude Harrison Baylous and the said William T. Hall lived with each other, claiming to be husband and wife, until on or about the 19th day of August, 1928, when the said William T. Hall departed this life intestate, seized and possessed of the title in fee simple to the real estate involved in this suit.'' Such rights as she claims in Hall's estate are based on the April marriage. All the cohabitation shown in the case was admittedly ''pursuant'' to the April marriage. The evidence clearly negatives the existence of a valid marriage between the parties after the bar of the statute was removed.

The judgment herein complained of must therefore be affirmed. *Affirmed.*

(Note upon denial of rehearing)

Upon consideration of the petition for rehearing, two members of the court, as disclosed by JUDGE MAXWELL's .dissent, took the position that there is an incongruity between section 1, chapter 64, Code, and section 14, thereof, in view of the construction placed on said last-mentioned section. To my mind

there is no such incongruity; the distinction between the sections is clear. Under the latter, which is a recent statute, we have to deal with a judicial dissolution of the marriage status, together with a judicial mandate against remarriage of the divorced parties, except to each other, within a period of six months. These elements are not dealt with under section 1. Of what avail is the prohibition in section 14, if there must be a second judicial proceeding to annul a marriage committed in plain violation of it? Such a construction would defeat the obvious purpose of the act. It is not presumed that the Legislature intended that the result of its deliberate act be a nullity. Hence we invoke the cardinal rule of construction that no statute should be construed as to produce such an effect. We see no reason for not adhering to the conclusion announced in the original opinion.

MAXWELL, JUDGE, (dissenting on petition for rehearing).

When this case was decided all of the members of the court concurred in the decision and in JUDGE WOODS' very able opinion, although JUDGE LITZ and I were not very well satisfied with the result. After having given the matter still further consideration and study on petition for rehearing, we desire to withdraw our concurrence in the decision and to note our dissent.

I am constrained to dissent because in my opinion the construction which the court has given to section 14 of chapter 64 of the Code creates an incongruous situation when considered in the light of the provisions of section 1 of the same chapter of the Code. The incongruity is this: The appellant, under the court's construction of said section 14, is placed in a worse situation by reason of having remarried within six months after having obtained a divorce from the bonds of matrimony from her first husband than if she had married a second husband while the bonds of matrimony still existed between her and her first husband. If she had married a second husband without divorce from the first one, the second marriage would have been "void from the time * ° * so declared by a decree of divorce or nullity." Not having committed that grievous impropriety, but having committed the less reprehensible offense of remarrying within the inhibited period fixed by the court in

her divorce decree, her second marriage, according to the majority construction of the statute, is void *ab initio*. She is worse penalized for the lesser indiscretion than she would be for the greater one.

Of course if the word "void" as used in the said section 14 must be construed in its literal and strict and absolute sense without regard to any other provisions of the statute and without regard to the legislative history of Virginia and West Virginia with reference to inhibited marriages, then the conclusion which the court has reached in the foregoing opinion is unanswerable; but if section 14, when considered in connection with other statutory provisions and in the light of former enactments, can be interpreted in accordance with recognized tenets of construction so as to relieve what I consider to be the glaring incongruity above pointed out, it is my opinion that such interpretation should be adopted.

We took section 1 of chapter 64 of the Code from the Code of Virginia, but we changed the section in an important particular. That section as found in the Virginia Code of 1860, chapter 109, section 1, declares marriages between white persons and negroes and marriages which are prohibited by law on account of either of the parties having a former wife or husband then living to be "absolutely void, without any decree of divorce, or other legal process." The Virginia statute then declares the other inhibited marriages to be "void from the time they shall be so declared by a decree of divorce or nullity, or from the time of the conviction of the parties" for such offense. When we adopted that section the provision which declared the first two classes of inhibited marriages to be void *ab initio* was changed, and those two classes of marriages were included with the other inhibited marriages, and all were made void from the time they were so declared by a decree of divorce or nullity. Thus there was plainly evinced the policy of the new commonwealth to place solely in the courts the right to declare inhibited marriages void, and that such marriages should not be deemed void until so declared. No other statute bearing on the subject was enacted until 1915. Now, the policy of the state having been thus clearly manifested, and having remained unimpaired for nearly half a century, should not that policy be

looked to in considering the later section? The books so indicate. "Prior legislation on the subject, the entire legislation at the time, and the reasonableness or otherwise of one construction or the other, are matters competent for consideration." 25 Ruling Case Law, p. 1029; *Coal & Coke R. Co.* v. *Conley,* 67 W. Va. 129, 179, 67 S. E. 613. And there is no rule of statutory construction more firmly established than the one which requires that current statutes in *pari materia* should be considered together. "Statutes relating to the same subject, whether passed at the same or different times, must be read and construed together." *State* v. *Reed,* 107 W. Va. 563, pt. 2, syl., 149 S. E. 669.

In the case of *State* v. *Snyder,* 89 W. Va. 96, 108 S. E. 588, this court held that the remarriage of a divorced person contrary to the prohibition in the divorce decree against remarriage within a specified time renders the offending party "criminally liable the same as if no divorce had been granted." Thus, in so far as criminal liability is concerned, the two classes of cases are on the same plane; that is to say, a divorced person who remarries within the prohibited period, and a married person who contracts a second marriage while the first spouse is living and undivorced are alike dealt with as bigamists. So much for the criminal side. There we find consistency. I would maintain consistency on the civil side as well, by the simple process of construing the two statutes together, in the light of the legislative history of this commonwealth and of the Old Dominion. I would read into the later statute the words "from the time it is so declared by a decree of divorce or nullity." In so doing I would rely upon another basic principle of statutory construction, namely, that when a statute is susceptible of two constructions, one of which involves inconsistency and the other does not, the latter should be adopted. "But when the design of the legislature is not clearly apparent, it is always to be presumed that a statute was intended to have the most reasonable and beneficial operation that its language permits. And when a statute is ambiguous in terms or fairly susceptible of two constructions, the injustice, unreasonableness, absurdity, hardship, or even the inconvenience which may follow one construction may properly be considered

and a construction of which the statute is fairly susceptible may be placed on it that will avoid all such objectionable consequences and advance what must be presumed to be its true object and purpose." 25 Ruling Case Law, p. 1017. See also, Lewis' Sutherland, Statutory Construction (2d Ed.) vol. II, § 490.

For these reasons I would reverse the decree of the trial chancellor.

I am authorized to state that JUDGE LITZ concurs in this position.