## HENDERSON *v.* HENDERSON
[No. 111, October Term, 1951.]

*Decided March 7, 1952.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS and MARKELL, JJ.

*Roscoe H. Parker* and *Bird H. Dolby,* with whom were *Dolby & Parker,* on the brief, for appellant.

*Robert W. McCullough,* with whom were *William T. Pace,* on the brief, for appellee.

DELAPLAINE, J., delivered the opinion of the Court.

Nannie Irene Henderson instituted this suit in the Circuit Court for Prince George's County to obtain a divorce *a mensa et thoro* from her husband, Nathan F. Henderson, and other relief.

Complainant alleged in her bill: (1) that she married defendant in Ottumwa, Iowa, on November 6, 1943; (2) that as a result of the marriage one child was born; (3) that defendant treated her in such a manner as to make life almost unbearable for her; that on July 16, 1950, he beat her about the face and body, and because of the beating she was taken to a hospital by defendant's son; and while she was there defendant warned her that if she returned home he would kill her; that on August 1, 1950, he attacked her in the courthouse in Upper Marlboro for the reason that she picked up their daughter in her arms; and (4) that because he had subjected her to cruel and inhuman treatment and had forced her from home by fear of great bodily harm, he was guilty of constructive desertion.

In a cross-bill for an annulment of their marriage, defendant alleged: (1) that complainant was divorced from F. Gorman Hatcher, Jr., by the Circuit Court of Fauquier County, Virginia, on September 27, 1943, by a decree which had no final effect until after the lapse of six months; and (2) that at the time of the wedding in Iowa, he was unaware that complainant was incapable of entering into a valid marriage contract, and that her failure to inform him of that fact was fraud and caused him humiliation and embarrassment.

The chancellor granted complainant a divorce *a mensa et thoro,* awarded the custody of the child to complainant, with the right to defendant to see the child at reasonable

times, ordered defendant to pay $10 per week as alimony and $5 per week toward the support of the child, and to pay to complainant's solicitor a counsel fee of $300, and dismissed defendant's cross-bill. Defendant appealed from that decree.

Three main questions are presented on this appeal: (1) whether the marriage performed in Iowa within the prohibited period of six months was void; (2) if the Iowa marriage was void, whether the parties had entered into a common-law marriage; and (3) if there was a common-law marriage, whether it should be recognized in Maryland.

The first question brings before us the Virginia decree, which divorced F. Gorman Hatcher, Jr., from Nannie Edwards Hatcher on September 27, 1943. The decree provided "that the bonds of matrimony which were created by the aforesaid marriage be and the same are hereby dissolved; but neither party hereto shall be permitted to marry again for a period of six months from the date of this decree."

The decree was entered in accordance with the Virginia statute, which provided at that time as follows: "On the dissolution of the bond of matrimony for any cause arising subsequent to the date of the marriage, neither party shall be permitted to marry again for six months from the date of such decree, and such bond of matrimony shall not be deemed to be dissolved as to any marriage subsequent to such decree, or in any prosecution on account thereof, until the expiration of such six months." Va. Code 1919, sec. 5113.

Restrictions against speedy marriage of divorced persons have been included in the statutes of many of the States. It has been generally recognized that one of the frequent causes of divorce is the desire of a married person to marry another, and as this could originally be done immediately after the entry of a decree of divorce, there was the temptation to secure the divorce by collusion in circumvention of the law. The Virginia Statute

was enacted by the Legislature to lessen that temptation and to help in preserving existing marriages.

The question whether a marriage of a divorced person within the prohibited period after divorce is void or voidable depends upon the language of the statute and the construction given to it by the court. *Hall v. Baylous,* 109 W. Va. 1, 153 S. E. 293, 69 A. L. R. 527; *Schuchart v. Schuchart,* 61 Kan. 597, 60 P. 311, 50 L. R. A. 180. In Minnesota, for example, where the statute prohibited the marriage of divorced persons within six months from the date of the divorce decree, the Supreme Court of that State held that the marriage of a divorced person within that period is valid until dissolved by a judicial decree. *State v. Yoder,* 113 Minn. 503, 130 N. W. 10.

The Supreme Court of Appeals of Virginia held in 1923 in *Heflinger v. Heflinger,* 136 Va. 289, 118 S. E. 316, 32 A. L. R. 1088, that a marriage of a person, who has been divorced in Virginia, within six months after the date of the decree, is absolutely void, even though the marriage is performed in another State, because the language of the statute making the decree effective only after the expiration of six months is entitled to full faith and credit in every other State, under Article 4, Section 1, of the Federal Constitution. However, see *Dimpfel v. Wilson,* 107 Md. 329, 68 A. 561, 13 L. R. A., N. S., 1180.

Secondly, assuming without deciding, that the Iowa marriage was void, the next question is whether the parties entered into a common-law marriage. The origin of the American law of marriage can be traced back to the ancient canon law, which consisted of the decrees of various Popes, and was the basis of the matrimonial law of England. Under the canon law, the contract of marriage, which originated as a contract of the law of nature, was regarded as simply of a consensual nature, differing from other contracts only in its being indissoluble even by the consent of the parties. That marriage might be validly contracted by mutual promises alone, without the presence or benediction of a priest, was originally an established principle of the Roman law.

While the Church elevated marriage to the dignity of a sacrament, it respected its natural and civil origin. After it had been supposed in England for many years that the doctrine of informal marriages was an accepted rule of the common law, as derived from the ecclesiastical law, the doctrine was overturned in 1844 by the House of Lords, which, being equally divided on the question of the validity of a marriage *per verba de praesenti,* resolved it in the negative. The *Queen v. Millis,* 10 Clark & Fin. 534, 17 Eng. Rul. Cas. 66, 8 Eng. Reprint 844. Six years after the decision of the House of Lords, Justice Grier said in the United States Supreme Court: "Whether such a marriage was sufficient by the common law in England, previous to the Marriage Act, has been disputed of late years, in that country, though never doubted here." *Hallet v. Collins,* 10 How. 174, 13 L. Ed. 376, 379.

On the Continent of Europe clandestine marriages, although they subjected the parties to the censures of the Church, were held valid by the civil and canon law. But a different rule was established by a decree of the Council of Trent in 1563. That decree made null and void every marriage not celebrated before a priest. The decree was adopted in most Catholic countries, and since that time marriage has been regarded as a sacrament. While the Church might punish by her censures those who disregarded her ordinances, it was not within the power of an ecclesiastical decree to affect the status or civil relations of persons. That could be effected only by the supreme civil power. The decree of the Council of Trent never became effective in England, as that country, at the Reformation, disclaimed the doctrine of a sacrament in marriage, and retained those rules of the canon law which had their foundation, not only in any religious view of the subject, but in the natural and civil contract.

It was recognized in Maryland at an early day that the canon law regulating marriages, as derived from the Roman law, was accepted as a part of the common law of England, and was thus transplanted to the

Province of Maryland. But the Maryland Court of Appeals observed that the canon law was administered in England by ecclesiastical and civil tribunals, and there were no corresponding courts in Maryland to enforce them. *Harrison v. State,* 22 Md. 468, 483, 85 Am. Dec. 658. In 1872 Judge Alvey, speaking for the Court in *Denison v. Denison,* 35 Md. 361, 378, after stating that the common law had been adopted in Maryland only so far as it could be adjusted to our institutions, declared: "The ecclesiastical policy of England forms no part of the common law as we have adopted it. We have in our system no tribunal, as in England, clothed with power and jurisdiction to enforce the solemnization of marriages between parties contracting *per verba de praesenti.* Unless, therefore, there be something in the law of this State, apart from the common law of England, to render such contracts valid without solemnization, it follows, necessarily, that they can, at most, only be valid to the extent that they are good at the common law without solemnization, and, as we have seen, such unsolemnized contracts are incomplete, and are not effectual to confer legitimacy upon the issue, nor the rights of property upon the parties, a right that is attempted to be enforced in this case."

The law in Maryland had thus long been established that a common-law marriage is not valid. *Mitchell v. Frederick,* 166 Md. 42, 170 A. 733, 92 A. L. R. 1412; *Townsend v. Morgan,* 192 Md. 168, 173, 63 A. 2d 743. The requirements of the Maryland statute* as to the formalities of marriage are mandatory, and hence a religious ceremony must be superadded to the civil contract to make the contract of marriage valid. *Feehley v. Feehley,* 129 Md. 565, 99 A. 663. Maryland has not been alone in that position. In 1879 the Supreme Judicial Court of Massachusetts, speaking through Chief Justice Gray, said in *Commonwealth v. Munson,* 127 Mass. 459, 460, 461, 34 Am. Rep. 411, 413: "In Massachusetts, from very early times, the requisites of a valid marriage have been regulated by statutes of the Colony, Province,

and Commonwealth; the canon law was never adopted; and it was never received here as common law, that parties could by their own contract, without the presence of an officiating clergyman or magistrate, take each other as husband and wife, and so marry themselves."

But while a ceremony was usually performed by a clergyman, Justice of the peace, or public officer authorized by statute to perform the ceremony for the sake of certainty and notoriety, it was widely recognized in American law at an early date that an agreement *per verba de praesenti* to be husband and wife constitutes a valid marriage without the necessity of any formal ceremony. In many of the States it has been held that, in the absence of a statute declaring positively that any marriage not celebrated in the manner prescribed therein shall be void, a marriage made according to the common law without observing the statutory regulation is valid. The courts have stated that the purpose of statutes requiring the issuance of a marriage license, and the recording of a certificate of the marriage, is to discourage deception and seduction, to prevent illicit intercourse under the guise of matrimony, to relieve from doubt the status of parties who live together as man and wife, and to furnish evidence of the status and legitimacy of any offspring of the marriage. *State v. Walker*, 36 Kan. 297, 13 P. 279, 59 Am. Rep. 556; *Reaves v. Reaves*, 15 Okla. 240, 82 P. 490, 2 L. R. A., N. S., 353.

In *Meister v. Moore*, 96 U. S. 76, 24 L. Ed. 826, 827, Justice Strong said: "Statutes in many of the States, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence they are not within the principle, that where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common law right; but there is always a presumption that the Legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a

prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witnesses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good notwithstanding the statutes, unless they contain express words of nullity."

Common-law marriages are recognized in the District of Columbia. In *Thomas v. Holtzman,* 7 Mackey, 18 D. C., 62, 66, the Supreme Court of the District of Columbia, by Judge Merrick, said: "In the first place it is not at all apparent that it ever was the law that a marriage *in facie ecclesiae,* was necessary for the purpose of legitimating the issue. It is true that the Court of Appeals of Maryland in the last four or five years has decided that such was the law, but that decision is not binding upon us. It is laid down by Blackstone that a marriage *per verba de praesenti* without the intervention of a clergyman is a legitimate marriage. And both Story and Kent say, that according to the universal understanding in this country a marriage *per verba de praesenti,* without the intervention of a clergyman, followed by cohabitation, makes a legitimate marriage."

It has been held by the United States Court of Appeals for the District of Columbia that the removal of an impediment to marriage while parties continue to live together as husband and wife in the District of Columbia gives rise to a common-law marriage. *Thomas v. Murphy,* 71 App. D. C. 69, 107 F. 2d 268; *Parrella v. Parrella,* 74 App. D. C. 161, 120 F. 2d 728. In *McVicker v. McVicker,* 76 U. S. App. D. C. 208, 130 F. 2d 837, where the parties were married in Virginia before the end of the six-month

waiting period prescribed by the decree, which divorced the husband from his former wife, but relying on the ceremonial marriage lived together as husband and wife in the District of Columbia for more than two years, the Court held that the removal of the impediment to marriage while the parties continued to live together as husband and wife gave rise to a common-law marriage.

In the present case the parties were married in Iowa on November 6, 1943, but after the wedding they left for California, where defendant was stationed for about ten days pending orders to leave for service overseas. When defendant left the United States, complainant came to Maryland. For about a month she stayed in the home of defendant's mother in Mount Rainier. She then moved into a furnished apartment in Washington. Defendant returned to this country in May, 1945. Receiving his discharge from military service shortly afterwards, he came to Washington and moved into his wife's apartment. In January, 1946, he contracted to purchase a house in Cheverly, situated in Prince George's County in the suburban area of Washington; but it was not until June that he settled for the property and moved with his wife into the new home. His wife gave birth to their daughter in July, 1946. They lived together in Cheverly from 1946 until the separation in July, 1950.

It is recognized in jurisdictions where formal solemnization of marriages is not necessary that where the parties desire marriage, and do what they can to render their union matrimonial, yet one of them is under a disability, as where there is a prior marriage undissolved, their cohabitation, thus matrimonially meant, will in law make them husband and wife from the moment when the disability is removed. It is immaterial whether or not they knew of its existence or its removal. Such a case presents mutual present consent and consummation. Although cohabitation was introduced by a formal marriage ceremony, and the parties supposed erroneously that the impediment of a former marriage had been taken away, and never had their mistake corrected, never-

theless, in jurisdictions where formal solemnization is not necessary, valid marriage may be presumed to have occurred after the impediment was removed. As Bishop points out, "the living together of marriageable parties a single day as married, they meaning marriage, and the law requiring only mutual consent, makes them husband and wife; for here are all the elements of a contract of present matrimony." 1 Bishop, Marriage, Divorce and Separation, sec. 975.

The case before us is doubly clear because the parties cohabited as husband and wife in the District of Columbia for about a year from the Spring of 1945 until June, 1946. It is impossible to explain their conduct towards each other while living in the District on any other theory than that they agreed to be husband and wife. Cohabitation as husband and wife is a manifestation that the couple had consented to contract that relation. There can be no rational conclusion other than that the parties, who lived together as husband and wife in Washington, entered into a common-law marriage under the law of the District of Columbia.

Thirdly, we come to the question whether the common-law marriage should be recognized in Maryland. We accept the general rule that a marriage valid where contracted or solemnized is valid everywhere, unless it is contrary to the public policy of the forum. *Jackson v. Jackson,* 82 Md. 17, 28, 33 A. 317, 34 L. R. A. 773; *Bannister v. Bannister,* 181 Md. 177, 29 A. 2d 287. The reason for this rule is that it is desirable that there should be uniformity in the recognition of the marital status, so that persons legally married according to the laws of one State will not be held to be living in adultery in another State, and that children begotten in lawful wedlock in one State will not be held illegitimate in another. *Medway v. Needham,* 16 Mass. 157, 8 Am. Dec. 131; *Lando v. Lando,* 112 Minn. 257, 127 N. W. 1125, 30 L. R. A., N. S., 940.

The State has the sovereign power to regulate marriages, and accordingly can determine who shall assume

and who shall occupy the matrimonial relation within its borders. Such effect as may be given by a State to the marriage laws of another State is merely because of comity, or because public policy and justice demand the recognition of such laws. *Toler v. Oakwood Smokeless Coal Corporation*, 173 Va. 425, 4 S. E. 2d 364, 127 A. L. R. 430. However, the State is not bound to give effect to marriage laws that are repugnant to its own laws and policy. Marriages that are tolerated in another State but are condemned by the State of Maryland as contrary to its public policy will not be held valid in this State. One illustration of this exception to the general rule arises from the Maryland statute declaring void any marriage of a white person and a Negro. In *Jackson v. Jackson*, 82 Md. 17, 30, 33 A. 317, 319, the Court said that, although such marriages may be valid elsewhere, they will be absolutely void in Maryland as long as the statutory prohibition remains unchanged.

The statutory provisions for solemnization of marriages relate to form and ceremony and do not cause a marriage which has been entered into in some other jurisdiction to fall within the exception to the general rule that a marriage valid where contracted or solemnized is valid everywhere. We have adopted the generally accepted rule that where a valid common-law marriage has been entered into in a jurisdiction which recognizes the validity of such a marriage, it will be recognized as valid in another jurisdiction, regardless of the rule which prevails in the latter jurisdiction in respect to the validity of common-law marriages. *Whitehurst v. Whitehurst*, 156 Md. 610, 145 A. 204; *Darling v. Dent*, 82 Ark. 76, 100 S. W. 747; *Travers v. Reinhardt*, 25 App. D. C. 567, affirmed, 205 U. S. 423, 27 S. Ct. 563, 51 L. Ed. 865; *Huff v. Huff*, 20 Idaho 450, 118 P. 1080; *Butterfield v. Ennis*, 193 Mo. App. 638, 186 S. W. 1173; *Re Huston*, 48 Mont. 524, 139 P. 458; *Gibson v. Gibson*, 24 Neb. 394, 39 N. W. 450; *Re Wells*, 123 App. Div. 79, 108 N. Y. S. 164, affirmed, 194 N. Y. 548, 87

N. E. 1129; *Nelson v. Carlson,* 48 Wash. 651, 94 P. 477; *Great Northern R. Co. v. Johnson,* 254 F. 683.

In conclusion, defendant made the technical objection that, even though complainant may be entitled to relief, her bill should be dismissed on the ground that after she alleged that she and defendant were married in Iowa in 1943, she neglected to allege that the marriage was void. We find no merit in that objection. Usually a bill for a divorce contains an allegation that the parties were married in a certain place at a certain time. Such allegation is a formal one that seldom meets with objection. Thus it is held that where a bill for a divorce contains an allegation that the parties were married, but does not allege that they were lawfully married, the court will assume that the marriage was a lawful one until proof to the contrary has been given. *Etheridge v. Etheridge,* 120 Md. 11, 87 A. 497.

In this case defendant filed a cross-bill alleging: (1) that he and complainant "went through a marriage ceremony" in Iowa on November 6, 1943; (2) that complainant "represented herself as being a divorcée"; (3) that at that time complainant, unknown to defendant, had not been finally divorced from her previous husband; and (4) that, under the decree of divorce in Virginia, complainant was incapable of entering into a valid marriage with defendant on November 6, 1943, and therefore the alleged marriage was void.

Complainant filed an answer to the cross-bill alleging: (1) that she and defendant "were going together and intended to live as husband and wife," and that their intention had existed for a long time prior to the wedding in Iowa; (2) that after the wedding they lived together in Iowa as husband and wife; (3) that while defendant was in the military service she resided in the District of Columbia; and (4) that after defendant returned from the service they lived together as husband and wife in the District of Columbia and held themselves out to their friends, acquaintances and business associates as husband and wife.

A cross-bill is a proceeding to obtain a complete determination of a matter already in litigation in the court. As a general rule, whenever the defendant relies upon the equities of his case for anything beyond defense and seeks affirmative relief, he should file a cross-bill. The cross-bill may set up additional facts not alleged in the original bill where they constitute part of the same defense and relate to the same subject matter; but although the allegations of the cross-bill must relate to the subject matter of the original bill, it is not restricted to the issues under it. *Hooper v. Central Trust Co. of New York,* 81 Md. 559, 576, 32 A. 505, 29 L. R. A. 262. We find that defendant was not prejudiced by omission of any allegation in the original bill in reference to the marriage.

We find nothing to show that the chancellor erred in granting complainant relief. The decree will therefore be affirmed.

*Decree affirmed, with costs.*